## Gideon T. Beebe and another v. Hubbard Knapp.

*Pleadings: Declaration: Deceit: Scienter: Assumpsit: Trover: Misjoinder.*
    The first count in the declaration in this case, setting forth the exchange of a span of horses of the plaintiff's for a note held by defendants and a certain sum of money, and alleging that the defendants, by warranting, pretending and representing the note to be good and the maker to be responsible, falsely and fraudulently sold and exchanged said note and said sum of money for said span of horses, etc.; that the note was not good nor the maker responsible,

and that by means of the premises the plaintiff has been deprived of the use of his horses, etc., is not open to the objection that, inasmuch as it does not allege a *scienter* on the part of the defendants, it must be treated as a count in assumpsit upon contract, and is therefore improperly joined with the second count, which is an ordinary count in trover for the same horses; the statement that the defendants falsely and fraudulently represented the note to be good, etc., certainly implies sufficient knowledge of the falsehood of the representations to render them liable for the consequences of the fraud, and is at least an argumentative allegation of defendants' knowledge, such as, in the absence of a demurrer, would be cured by verdict.

*Conspiracy to defraud : Acts and statements of one conspirator : Evidence.* The evidence in the case tended to show that both defendants, in making the trade with the plaintiff, acted in concert, with a common purpose to obtain his team for the note and a small sum of money, without any good reason to believe the note to be good or their representations to be true, and that both were jointly interested in the trade: and this would authorize evidence of the acts and statements of either in regard to any part of the transaction or subject matter, as the acts, representations and statements of both, though done or made in the absence of the other.

*Evidence : Statements of third person referred to for information.* One of the defendants having referred the plaintiff to the maker of the note in question for information, any statements made by him in reference to the note at that interview are as much a part of the *res gestæ* as if made in the defendants' presence, or even as if made by themselves.

*False representations : Reliance : Evidence.* It was not error to allow the plaintiff to testify that he relied upon the representations and believed them to be true, as this was a vital point in the case upon which his knowledge exceeded that of any one else.

*Tender : Evidence.* The objection to permitting the plaintiff to testify that he made the tender of the sum of money received by him of defendants, in legal tender greenbacks, for the reason that the only proper course was to produce the thing tendered, is not well taken.

*Representations : Evidence : Quo animo.* Statements and representations of one of the defendants, made about the same time, a little before and a little after the trade with plaintiff, concerning other notes made by the same person, and his responsibility, in attempts to trade them off for horses and other property, are held admissible as showing the *quo animo.*

*Conspiracy : Acts of third person : Quo animo.* Evidence also of the representations and transactions of a third person who was present when the trade with plaintiff took place, made and had, both while accompanied by, one of the defendants, and when alone, concerning these notes, and the maker thereof, going to show that he and defendants were acting in concert in dealing in these notes with a common design to defraud whomsoever they might deceive into trading for the notes, are held admissible on the same ground.

*Conspiracy : Combinations to defraud : Evidence.* In cases of conspiracies or combinations to commit a fraud it is difficult to draw any precise line between the relevant and the irrelevant; and all evidence must be held admissible which has any tendency to prove the conspiracy or combination and its nature and objects, so far as these can have any bearing upon the issue on trial.

*Evidence : Cross-examination.* Where a witness in his direct examination has testified in reference to a promissory note on which he says the holder at a certain interview requested payment, that he thought the note was not due at the time, and has identified the note, it is competent on cross-examination to read the note itself in evidence, to show that it was past due at the time, as tending to show the imperfection of his memory, and thus to affect his credit.

BEEBE *v.* KNAPP.

*Tender: Evidence.* Where two persons are both interested, a tender to either is sufficient, especially if both are present; and the question whether the tender was to one, or the other, or both, was a fair one for the jury if material.

*Tender: Greenbacks: Fractional currency.* A tender made in greenbacks and fifty-cent fractional United States currency is sufficient where no objection was made to the tender on this ground at the time.

*Evidence: Cross-examination: Quo animo: Errors that do not prejudice.* On cross-examination of one of the defendants who had testified that he had sold some other horses for which he had traded other similar notes, it was competent to ask him what he got for the horses; if he had sold them soon after their purchase for less than he had paid for them in such notes, it might tend to show knowledge on his part that the notes were not good, and thus to show the *quo animo* of the trade with plaintiff; but if not strictly admissible, it was simply impertinent, having no bearing upon the case, and could not possibly have injured the defense; and the answers elicited could have no such effect.

*Cross-examination: Past life and conduct of witness: Discretion.* On cross-examination the trial court must be allowed considerable latitude of discretion in permitting questions calculated to elicit any information as to the past life and conduct of the witness, and to enable the jury to see "what manner of man he is;" and it is held not erroneous in this case to have permitted certain questions of this character, although in the opinion of this court it would have been a wiser exercise of discretion to have excluded them.

*Cross-examination: Errors that do not prejudice.* The admission on cross-examination, of questions not strictly admissible, is not error for which a judgment will be reversed, where the answers were harmless to the party objecting, and could not have prejudiced them.

*Cross-examination: Credit of the witness.* It was error to permit a witness who had not been connected with the defendants in the alleged conspiracy or combination, to be asked on cross-examination, against objection, what he got for certain other similar notes he had, where the direct examination had not touched upon the subject; since the evidence might, perhaps, have affected the credit of the witness with the jury, as tending somewhat to show a bias on his part in favor of the defense.

*Trover: Fraud: False representations: Scienter: Deceit.* To maintain the count for trover in this case, it was not necessary for the jury to find that the defendants knew the representations as to the note and the maker thereof to be false, provided they found "that they believed them to be false, or that they made them recklessly, without any knowledge or belief as to the truth of what they represented, intending to deceive and defraud the plaintiff."

*Deceit: Fraud: False representations: Scienter: Recklessness.* To maintain an action for the deceit in making false representations, upon the faith of which another has acted, it is not necessary to show that the party making them knew them to be false, if made for a fraudulent purpose; if a party recklessly makes a false representation, of the truth or falsehood of which he knows nothing, for the fraudulent purpose of inducing another, in reliance upon it, to make a contract or do an act to his prejudice, and the other party does so rely and act upon it, the party making the representation is liable for the fraud as much as if he had known it to be false; and this principle applies equally whether the case be tried in a court of law or of equity.

*Heard July 23. Decided October 8.*

Error to Kalamazoo Circuit.

*Edwards & Sherwood,* for plaintiffs in error.

*Severens, Potter & Boudeman,* for defendant in error cited, on the question of the necessity of proving that defendants knew the representations made by them to be false, the following authorities: *Converse v. Blumrich, 14 Mich., 123 ; Marsh v. Falker, 40 N. Y., 562 ; Bankhead v. Alloway, 6 Coldw. (Tenn.), 56 ; Cabot v. Christie, 42 Vt., 121; Fisher v. Mellen, 103 Mass., 503; Wheelden v. Lowell, 50 Me., 499; Thomas v. McCann, 4 B. Mon., 601; Lockridge v. Foster, 4 Scam., 569; Dunbar v. Bonested, 3 Scam., 32; Van Arsdale v. Howard, 5 Ala., 596; Munroe v. Pritchett, 16 Ala., 785; Parham v. Randolph, 4 How. (Miss.), 435; Buford v. Caldwell, 3 Mo., 477; and Snyder v. Findley, Coxe, 48.*

CHRISTIANCY, CH. J.

This was an action brought by defendant in error in the Kalamazoo circuit court.

The declaration contains two counts. The first sets forth, substantially, that on the 14th day of May, 1869, the plaintiff, at the special instance and request of the defendants, bargained with them to exchange a certain span of horses of the plaintiff's, of the value of three hundred and seventy-five dollars, for a note held by defendants given for three hundred dollars, and seventy-five dollars to be paid by defendants; and that "the said defendants, by then and there warranting, pretending and representing said note to be good, and the maker thereof to be responsible, then and there falsely and fraudulently sold and exchanged the said note, together with the said sum of seventy-five dollars, with the plaintiff for said span of horses; and that plaintiff, confiding in said representations and pretenses of the defendants, on etc., delivered his said horses to defendants for said note and said seventy-five dollars;" that at the time of making said false and fraudulent representations

and pretenses, and of said exchange, said note was not good, nor the maker responsible, but that it then was, and still is, worthless, and the maker was, and still is, irresponsible; and that by means of the premises the plaintiff has been deprived of the use of his horses. And so said plaintiff says that defendants, on said sale and exchange, falsely and fraudulently deceived and defrauded the plaintiff as aforesaid.

The second count is an ordinary count in trover for the same horses.

The declaration concludes: "To the damage of the plaintiff of five hundred dollars."

It was objected by the defendants below, that as the first count does not allege a *scienter* on the part of the defendants, it must be treated as a count in assumpsit upon contract, and could not therefore be joined with the second, in trover; that the declaration was bad for the misjoinder, and no evidence could properly be given under it; and several errors are assigned, based upon this view.

But we think the first count cannot fairly be treated as a count in assumpsit. It alleges no promise or agreement as the gist of the action, but only as inducement; and though it alleges the bargain to have been brought about by "warranting, pretending and representing" the note to be good, and the maker to be responsible, the word and the idea of "warranting" is entirely dropped in all subsequent portions of the declaration, and the whole ground of action is made to rest upon the "fraudulent representations and pretenses" of the defendants in reference to the note and the maker, in reliance upon which, it is alleged, the plaintiff completed the trade and delivered the horses.

These representations are alleged to be fraudulent, and to be false and fraudulent, and therefore that the plaintiff was, by the defendants, falsely and fraudulently deceived on said sale, and deprived of the use of his horses.

As to the want of a *scienter*, it is true the declaration does not, in so many words, allege that the defendants at

28 MICH.—8.

the time " well knew that the said note was not good, and
the maker irresponsible," but it does allege that they "falsely
and *fraudulently*" represented the note to be good, and the
maker responsible.    This term, "fraudulently," in this con-
nection, of itself implies knowledge of the falsehood of the
representations, or sufficient knowledge, at least, to render
them liable for the consequences of the fraud.—See *1 Chit-
ty's Pl., 423 (citing Willes, 584); 1 Chitty's Pl., 157;
2 East, 446; 4 Bing., 73; id., 66.*    At all events, this is
at least an argumentative allegation of defendants' knowl-
edge, and not being demurred to, is cured by verdict.—
*Kean v. Mitchell, 13 Mich., 207.*

There is, therefore, no misjoinder of causes, nor of forms
of action.    The nature of the causes of action is in legal
effect the same: the same plea may be pleaded, and the
same judgment given on both counts.    And though the
evidence tending to prove the *scienter* on the part of the
defendants was mostly, if not all, offered under the (second)
count in trover, it was equally applicable to both; the
theory of the plaintiff's action, as shown by the proof
offered, and all his proceedings on the trial, being that
defendants induced the plaintiff to make the trade or
exchange, by such false and fraudulent representations as
rendered the contract void at his option, so that the prop-
erty never passed to the defendants, or either of them, or if
it did, that it revested in the plaintiff by his subsequent
rescission of the contract, the same proof would be required
and admissible under the one count as under the other,
and no representations need to be set forth in the action of
trover.

The plaintiff below claimed on the trial: *First*, that,
though the purchase of the horses was nominally made, or
pretended to be made by or for defendant Beebe alone; yet,
that defendant Knight was also interested in the trade, and
that the horses were in fact purchased or obtained on the
joint account, and for the joint benefit, of both Knight and
Beebe; *second*, that Knight and Beebe acted in concert,

with the common design of deceiving and defrauding the plaintiff, and inducing him to trade, by falsely repre-senting the note to be good, and the maker responsible, knowing, or having good reason to believe, the contrary, or at least having no good reason to believe the representa-tions to be true, and that by these fraudulent means they did induce the plaintiff to trade, and to part with his property.

If the plaintiff could establish these two points to the satisfaction of the jury, he would be entitled to recover; any evidence, therefore, tending to establish any part of these two propositions, would tend to establish his cause of action, and must be admissible. A large number of excep-tions are taken to the evidence offered for the purpose of sustaining these propositions, and most of the questions in the case arise upon these exceptions. The plaintiff himself was the first witness sworn, and as his testimony shows clearly the nature of the case, and raises many of the points upon which exceptions are taken, and will tend to show the pertinency or impertinency of most of the evi-dence of other witnesses to which exceptions were taken, I here state the substance of his testimony, so far as material for these purposes.

"I was partially acquainted with defendant Beebe; we both live in Prairie Ronde township; met him at different times up to April, 1869; had no business transaction with him up to that time; he lived on Mary Knight's farm, a sister of defendant Knight; knew he had no farm of his own. Knew William Knight, the other defendant, who resides in School-craft. Did not then know Frank Calvert, who resides about four miles from me. I owned, on the 19th of April, 1869, a pair of matched mares four years old. Had negoti-ations with defendants that day in front of Johnson's. When defendants came, first saw Beebe driving; William Wheaton was with defendants. One of them, can't say which, spoke. They remained in the buggy until they asked me whether I would sell the team (meaning plaintiff's

team), or not.   One of them asked me if I had any thing
to trade; I replied, I had not.   They wanted to know if
I would sell that bay team; I said I would for money.
Knight got out, looked around the team, and taking me
one side, said they had no money, but wanted to buy a team
that day, and he wanted to turn out obligations, one note
against Sam Barber of fifty dollars, and another of seven
hundred dollars.   He pulled out other paper; one note
against Frank Calvert.   I told him I did not know Frank
Calvert, but did his brother James, and refused to take the
note.   Knight said Calvert was perfectly good for it, that
he had property, and that was the only note against him
that he knew of; that he had been very prompt in paying
his debts; that he had a hundred and sixty acres of land,—
and two shares in the homestead (of three hundred and
twenty acres), that was a hundred and sixty acres,—bought
one share of his sister, and his own share made two shares;
said that they had been around that morning on purpose to
see this team; that he had heard Beebe often speak of this
team; and that he was buying the team for Beebe.   Beebe all
this time was in the buggy with Wheaton.   I asked Knight
to guaranty payment of the note, but he would not do it.
Told Knight I would sell the team for three hundred and
fifty dollars.   Knight said he thought he would go and see
another team at some place, and urged me to go with
him; went with him; did not know where they were going.
We all went together and stopped at widow Calvert's.   One
of the party inquired for Frank Calvert, and was informed
by a boy he was at his brother James'.   While there, and
while going there, Beebe said the hundred and sixty acres
on the west side of the road belonged to Frank Calvert.
We then went back sixty or eighty rods.   I then got out
and went with Knight to James Calvert's; found him and
Knight in the barn.   Knight told me I could ask Frank
about the note.   James went out as we walked to the door.
I asked Frank if Knight held a note against him.   Frank
said he did not know.   I told him: Knight and Beebe

wanted to buy my horses, and they say they have a note against you."

[Objection by defendants to any conversation between plaintiff and Frank Calvert, not in presence of defendants; objection overruled,—exception,—witness proceeded.]

"I told him a $300 note, and he said it must be a $200 note, if either. I told him it was a $300 note, for I had seen it. He said it might be. There was nothing said in that interview about Frank's pecuniary responsibility. Knight came to the door, and asked me if I was ready to go, and I went away with Knight."

Being asked if Knight made any inquiry as to whether he had conversed with Calvert in relation to his pecuniary responsibility, he says: "When we were 30 or 40 rods from the barn, Knight asked what I thought of the note; I told him that I did not want to take the note, as he said it was the only note against Calvert, and Calvert said he did not know whether it was a $200 or a $300 note. Knight said he knew it was a $300 note, and he took it out of his pocket and showed me the figures $300. I stated all Calvert told me; that Calvert did not know Knight had any note against him. Knight then said Calvert owned 160 acres of land, buying out his sister's share, and owning one of his own in his father's estate; that made him 2-4ths of that 160 acres" [It was afterwards shown that he had not bought his sister's share, and that he only owned ¼ of the homestead subject to his mother's life estate]; "that he was perfectly good. Knight was the only man with me at this time, till we got over to where he left the wagon. I told him if he would sign the note, I would take it. He refused; said his mother had made him take an oath not to sign anybody's note. When we got to the corners we found Beebe there waiting for us with his buggy. We stopped there and talked a little."

[Defendant's counsel moved to strike out all the conversation between Knight and witness, because Beebe was not there. Objection overruled,—exception.]

"Knight wanted to know if I would take the note; I told him I could not at that price, and he told me to tell Beebe so, and I did.    Knight offered me $25 more, and said if I would take thé note he would raise the money in two weeks to pay the note, if I would then take $280 for it.    I told him I thought I would not do it, and started for the team.    Beebe followed me up, and wanted to know if Knight and I could not make a trade, and I finally told him if Knight would do what he agreed, I would take the note.    Knight said he would do it.    We then all got in the buggy and went to where the team was.    Told him my team had got to draw the load of lumber to the house. Beebe drove them ; and Knight, Wheaton and myself rode in their buggy, and went ahead.    All of us went into the house.    Wheaton wrote the check at request of Knight [for the $75 balance], and Knight signed it before Beebe came up.    Knight then took the check and note, and went out and unhitched the horses and put them in my barn.    Beebe took the horses and Knight handed me the check and note, and they got into the buggy and drove off.    Beebe took the horses and led them out, and Knight passed me the note and check.    They went off together.

"About a week or more after this I saw Knight in Schoolcraft, and asked him if he should be ready to pay that $280, for the note.    He said no, he should not.    I said, you told me that Calvert had 160 acres of land, and I thought he had at that time."

[This conversation was objected to as irrelevant, as it did not tend to prove the allegations in the declaration, and Beebe was not present; also on the ground of the misjoinder in the declaration, which has already been disposed of.    Plaintiff then offers it as evidence of guilty knowledge under the second count,—objections overruled,—exception.] Witness proceeds: "Knight said he thought he did." Witness reminded him of his agreement; Knight said he would not do it, and walked away.

Witness was then asked whether, at the time of these

representations, he relied upon them and believed them to be true. [Objected to as immaterial under the declaration,—overruled,—exception.] Witness answers: "I did. At the time I had no personal knowledge of the pecuniary responsibility of Frank Calvert."

He then testifies that he had a conversation with these defendants with regard to this team, on Mary Knight's farm, about a week after the trade; they were drawing wood, and one of the horses was in the team; they said the other horse was in the barn on the farm; that he asked who owned the horses, and they said they did; he thinks Beebe made this reply; that he then asked which of them owned them, and Beebe said he did; and then witness made him a tender, and demanded the horses, and said, here is your note and money; that he then turned to Knight and made the demand of him; witness then had the note in his hand, and $75 50 or $75 25 in money (was the $75 and interest at any rate); that they refused to take the money or note, or give him the horses; that he passed the money over to Stuart McRay. The note being here shown witness, he identifies it.

Being asked what kind of money he tendered [it was objected that it was not proper testimony: the thing tendered should be produced,—overruled,—exception], he answered: Legal tender greenbacks; that the value of the team was three hundred and seventy-five dollars; that he got the money (seventy-five dollars) on Knight's check. Being asked whether before making this tender he had ascertained what the responsibility of Frank Calvert was [objected to,—objection overruled,—exception], he answered that he had, about three or four days before.

This is the whole substance of the plaintiff's testimony, so far as it affects any question raised in the case. There were some other objections and exceptions taken to it in the course of the examination, upon which, however, no error is assigned, and which, therefore, I have not noticed.

Independent of the portion of the testimony above noticed as excepted to, I think it very clear that all the rest of the plaintiff's testimony very clearly tended to support the plaintiff's cause of action as stated in the declaration, and the theory of his action already stated. It tended very strongly to show, and from it the jury would have been authorized to find, that both defendants, in making the trade with the plaintiff, acted in concert, with a common purpose to obtain his team for the Calvert note, or that note and a small sum of money in addition, without any good reason to believe the note to be good, or their representations to be true. It tended also to show, with perhaps slightly less force, that both were jointly interested in the trade, and therefore, within the general rule, it authorized the proofs of the acts and statements of either in regard to any part of the transaction or subject matter, as the acts, representations and statements of both, though done or made in the absence of the other. This disposes of the second assignment of error, upon the refusal of the court to strike out the evidence of the conversation between Knight and the plaintiff, as well as of the third, as far as it relates to the same point, and shows that the court was correct in refusing the motion, upon the state of facts which the evidence tended to show. These conversations were as clearly admissible as against Beebe as if had with Beebe himself, and against both, as if had with and in the presence of both.

The first assignment of error, with a part of the 26th, is that the court erred in admitting evidence of the conversation between the plaintiff and Frank Calvert, when defendant Knight went to the barn of James Calvert, with plaintiff. It is difficult to see any thing in this conversation which could have prejudiced the defendants, if it was improperly admitted. But its admission was entirely proper. As already stated, the plaintiff's testimony tended to show that the acts and statements of one of the defendants were the acts and statements of both. Knight, one of the defendants, referred the plaintiff to Frank Calvert for information

in regard to the note, and this made the conversation upon that subject at that interview, as much a part of the case, —of the *res gestæ,*—as if it had been in the presence of both parties, and the statement of Calvert as clearly evidence, as if made by both the defendants.—*Rosenbury v. Angell, 6 Mich., 508 ; Beebe v. Young, 14 Mich., 136.*

We see no ground for the fourth assignment of error, in allowing the plaintiff to testify that he relied upon and believed the representations to be true. This was a vital point in the case; the evidence was therefore clearly relevant, and no one could know as well as himself, whether he relied upon and believed the representations.

The court also properly overruled the objection upon which the fifth assignment is made, "that the court improperly allowed the plaintiff to testify that he made the tender in legal tender greenbacks."

A series of exceptions was taken to evidence of what Knight had said to other parties about the same time, a little before, or a little after the trade with plaintiff, about these Calvert notes, and Calvert's responsibility, and of his attempt to trade them off for horses and other property to other persons, not alone for himself, but when with and apparently assisting Wheaton to trade off Calvert notes for property; and especially to the statements of Wheaton when engaged in these transactions, or in attempts to trade off such notes with the assistance of Knight in the absence of Beebe. It is conceded by the counsel for the plaintiff in error, that "in actions involving alleged fraud, when the knowledge and intent of the defendant is a material fact, evidence may be received of similar acts which happened shortly before or after, and which had no direct or apparent connection with the principal transaction; and where the question is whether a purchaser of goods procured them through fraud, distinct purchases made by him under similar circumstances, at or about the same time, and when the like motive may be reasonably supposed to have oper-

ated, are admissible in evidence with a view to the *quo animo.*"

And such substantially is the law.—*1 Cowen and Hill's Notes, note 333 (1st ed.); id., note 351; id. (4th ed.), note 210.* And within this principle, as well as tending to show Knight's intent in the purchase from plaintiff, I think it clear that all the acts, representations and statements of Knight, though in reference to other transactions, in the disposition or attempted disposition of these notes to other parties, were clearly admissible.

But it is urged that all such evidence, and all statements or acts of others introduced for the like purpose, must be pertinent to the issue and constitute a link in the chain of proof against defendants, and therefore the evidence respecting the transactions of Wheaton alone, and Wheaton with Knight, other than the one with the plaintiff, and especially of the acts and statements of Wheaton, was not admissible. But if the evidence objected to tends to show that not only Beebe and Knight, but Wheaton also, were dealing in these notes of Calvert so soon after they were given and before it became generally known how many had been given and for what purpose, were acting in concert, or with the common design or understanding to defraud whomsoever they might be able to deceive into a trade for the notes whether the proceeds were to be for the joint or separate accounts; and if their undue haste and anxiety to make such trades tended to show their belief that the notes were not as good and valuable as they represented them, then the acts and declarations of any one of them became the acts and declarations of all, as showing the *quo animo* of the defendants, and have a direct leaning upon the issue in this case; and such I think was the tendency of the evidence objected to. The representations and acts of Knight, when acting in connection with or in aid of Wheaton, could not be fully understood and appreciated without the acts and declarations of Wheaton upon the same

subject and in reference to the same transaction. And though, as the court charged, the *admissions* of a co-conspirator cannot generally be received as evidence against the others unless the conspiracy is made out by evidence beyond the admission itself; it is nevertheless competent to establish the conspiracy or combination by evidence of the separate acts and declarations of the several parties to it, all tending to the proof of the common purpose.—*People v. Saunders, 25 Mich., 119.* This is frequently, if not generally, the case in conspiracies or combinations to commit a fraud—a class of cases in which it is very difficult, as remarked by my brother Graves, in *Comstock v. Smith, 20 Mich., 345,* to draw any precise line between the relevant and the irrelevant. And all evidence must be held admissible which has any tendency to prove the conspiracy or combination, its nature or objects, so far as these can have any bearing upon the issue on trial,—the weight of the evidence is for the jury alone. The full bearing of the evidence cannot be appreciated without a pretty full reference to the evidence, which, being too long to be inserted in full in the opinion, I have embodied in a note.

---

NOTE.—Hayes saw Knight and Wheaton, the latter part of April or first of May, at Mattawan (this might be anywhere between the 19th of April and the 1st of May). Knight wanted to know if any one had horses to trade. Witness introduced them both to Durkee, Slack and others, and in accordance with what Knight had told him was their object, told these parties (as it seems in their presence), that they, or that Knight wanted to trade paper for horses; Knight asked witness what he considered Frank Calvert's credit. He answered good, for small sums. Knight said Wheaton had a note he wanted to trade for horses; that Calvert owned 160 acres of land. Witness asked him if he had any patent-right notes. Knight replied in the affirmative, and asked witness if he had any money to loan; and wished him to say yes, if Durkee or others should ask him if Knight had been to him to borrow money. [This it appears by the further testimony, was a mere trick to enable him to trade off, for himself or Wheaton, Calvert notes].

Slack, referring to the same time, says Knight introduced Wheaton to him. They said they came to trade for horses. Wheaton wanted to trade; showed him a note of Frank Calvert, of two hundred dollars. He wanted to trade with him, and referred him to Knight about the note. Knight recommended him as good; said he had 160 acres of land, and told witness if

I think the evidence was admissible; and this disposes of the 6th, 7th, 9th, 10th, 11th, 12th, 13th, 14th, 15th, 20th, 21st, and 22d, and portions of some other assignments of error, and shows that the evidence objected to was properly received.

The 18th assignment of error relates to a question put to James Calvert on his cross-examination. He had testified, on his direct examination, in reference to the interview at his barn, when Knight and the plaintiff came there on the day of the trade with plaintiff. He was asked in his direct examination in reference to the occurrence, what business Knight had with him at the time; to which he replied that Knight had a note against him; that he (K.) called him to one side, and they talked some; that Knight said if he, witness, had some money, he would like some on the notes to use, and witness thinks the note was not due at that time. On his cross-examination by the defense he testified: "I have never paid that note. I had not seen the note at that time. He only had one note against me." The note was here shown the witness, and he says: "This is

---

he (K.) could get the money he would take the note at a discount of twenty-five dollars, but did not get it.

Thomas saw Knight and Wheaton at his father-in-law's, in April, 1869. Wheaton saw teams of horses in the road, and asked if they were for sale; witness offered to sell him one of them for two hundred dollars. Knight was present. Wheaton wanted both horses. Witness offered to sell both, if pay was good. Knight and Wheaton went to one side and conversed by themselves. Wheaton said he had a note of Calvert's, he would like to turn out for the team, of two hundred dollars; witness refused it, without taking time for inquiry. They offered to take him to see Calvert; witness did not want to go; wanted to wait till next week. Wheaton said he wanted a team that day. Knight said the note was good,—that Calvert had 160 acres of land, etc. Witness rode with them to Calvert's, but he was gone, and Knight said he had gone to the lodge at Schoolcraft; said F. Calvert owned the personal property on the farm, etc. Witness traded the team for the note, on these representations. When witness asked Knight if they would guaranty the note, he said he would warrant the note good enough without their signatures.

Barnhardt had conversation with Wheaton a day or two before witness heard of F. Calvert giving the patent-right notes; conversed with him about Calvert notes. Wheaton said Calvert

the note." The note was then offered in evidence by the defendants' counsel. This was objected to as not proper cross-examination. The counsel for the defendants stated that they offered it for the purpose of showing that the note was past due at the time Mr. Knight asked the witness for the money, and when he says it was not due. Objection sustained,—exception. This note, thus produced and identified by the witness, appeared upon its face to have become due more than two months before the time in question.

This, I think, was error. When the witness identified the note as the one to which he alluded, he thus made that note a part of his testimony, and the defendants should have been allowed to have it read. It did not raise any collateral issue, within the spirit of the rule which forbids the introduction of evidence to disprove testimony given upon collateral matter. Had he denied its identity, other evidence within the rule in question would not have been admissible to contradict him. It should have been read as a part of his cross-examination, as tending to show the imperfection of his memory, and thus to affect his credit.

notes perfectly good; Calvert perfectly good, and said Calvert owned one-third of real estate of Calvert property, and had another share in prospect. Wheaton referred witness to Knight about the matter, and witness saw Knight there the same day.

Kinney says, in April, 1869, Knight wanted to trade him a $150 note of F. Calvert's for a horse; said that the note was perfectly good, but did not trade.

Beardsley saw Knight and Wheaton in Lawton, April, 1869, and conversed with them. Wheaton wished to purchase a horse, harness, and wagon, for a note of F. Calvert's, of one hundred and fifty dollars; witness objected as he was not acquainted with Calvert. Knight said the note was good; that Calvert owned a farm near him, horses, cattle, sheep, etc.; that the note was good as gold; wished he had a dozen of them. Knight said they were going to start a livery stable in Schoolcraft.

Shaver says Wheaton called at his house in April, 1869, and wanted to sell a note against F. Calvert, of one hundred and fifty dollars, for a horse; said the note was perfectly good; but they did not trade. Next day Wheaton and Knight came and proposed to buy his horse. Knight said "Wheaton wanted a horse, and was going to sell you a note yesterday;" witness asked one hundred and seventy-five dollars for the horse; said he did not want to buy the note. Knight said the note was perfectly good,

We see no ground for the 23d assignment.   The question whether the tender was made to Knight, or Beebe, or both, was a fair one for the jury, if material; but if both were interested, as the evidence tended to show, a tender to either was sufficient, especially as both were present.

Nor do we see any error in holding a tender made in greenbacks and fifty-cent fractional United States currency, to be sufficient, especially as it does not appear that any objection was made to the tender on this ground at the time of the tender.

The 25th, 26th, 27th and 31st assignments of error are not relied upon in the brief of the plaintiff in error, and I do not, therefore, notice them.

The 28th assignment relates to the cross-examination of defendant Beebe, who was sworn for defense, and testified that he had sold one of the horses he got of his brother (Bruce Beebe) for Calvert notes, already stated.   He was asked, on cross-examination, what he got for this horse; and having subsequently sworn that he had sold both of the horses he got of his brother, he was asked, on cross-examination, what he got for them.   These questions on cross-examination were objected to, and the objections over-

good as gold.  Knight said, "you know Calvert;" witness said no; "why", said Knight, "he is worth five thousand dollars."  Witness said if the note was perfectly good, he would take one hundred and sixty-five dollars.  Wheaton had shown me the note; Wheaton and Knight came together, but Wheaton was in the house, while this conversation took place out doors.  Witness asked Wheaton where the note came from; he said from Carl Merrill.  Witness agreed, if note was perfectly good, to take one hundred and sixty-five dollars, and Wheaton produced the note and money, and handed it to Knight, who gave it to witness, and the latter delivered the horse to Knight; Wheaton did not go out to see the horse.  Knight said F. Calvert was worth five thousand dollars, and that he knew his business nearly as well as he did himself.

We have already noticed that when the defendants approached the plaintiff to make a trade, Wheaton came with them in the same carriage, was present when the trade was made, and at the request of Knight, drew the check.

So much for Wheaton and Knight, and their dealings in Calvert notes.

But the evidence further shows that Beebe also, about the same time, had other dealings in these notes. About the same

ruled. I am inclined to think these questions were admissible. If he, for instance, had sold them soon after the purchase, for a greatly less sum than he had paid for them in the Calvert note, it might tend to show that he was conscious, at the time of the trade, that the Calvert note was not good, and thus to show the *quo animo* in the trade with the plaintiff. It is difficult to draw any precise line between that which is admissible and that which is not, upon such a question. But if it can be· seen that the question upon cross-examination might have elicited any evidence pertinent to the issue, it was not error to admit it. But if it was not strictly admissible on the ground suggested, it was simply impertinent, having no bearing upon the case, and could not possibly have injured the defense; and the answers elicited could have no such effect.

The 29th assignment of error is this: Beebe, having been, as it would seem, on cross-examination, asked how many times he had been married, said he had been married

---

time as this trade, probably just before, Beebe and Knight went to Munger, and attempted to trade a $300 Frank Calvert note for his team, for which Munger asked four hundred and fifty dollars, and Knight offered him a horse or some other notes for the difference, and recommended Frank Calvert as good, etc., as in his other attempts to bring about a trade.

Again, a few days before the 20th of April, Knight and Beebe went to the wagon shop of Mr. Stute at Schoolcraft, and Beebe wanted to trade wagons with Stute, who asked him fifty dollars to boot; and afterwards on the 20th of April, Beebe came back alone; said he had a note given [as other testimony showed, by Calvert] for four hundred dollars, with three hundred dollars endorsed on it, and offered this as the boot between the wagons, which Stute took, and has it yet. Beebe referred him to Knight, who said it was good.

Again, in April, 1869, Beebe traded off another $300 Frank Calvert note with Bruce Beebe for a span of horses,—said he had had a chance to sell his team for a high price for two notes of Frank Calvert of three hundred dollars each; and went and saw Calvert, and then traded and got these notes.

Again the same spring (time not definitely fixed), Beebe called on Edmunds at Prairie Ronde, and wanted to buy some horses for a note or notes against Calvert; told Edmunds, Knight came with him as far as the mill; recommended the notes as good, etc. Edmunds told him he would trade, if Knight would endorse the note. Beebe replied he guessed the note was good enough,—but no trade was made.

four times; that one of his wives was buried, and one of them at home, was then asked: " Where are the other two ?" This was objected to as irrelevant, the objection overruled, and exception taken.    His answer was: "I cannot tell; was first married 18 years ago." He was then asked: " How long did you live with that woman ?"    This was objected to, and the objection overruled ; and the witness answered : " Seven years.    I have not lived with any other women besides these; not what I call living with them."

These questions do not appear to have been put for the purpose of founding upon them any other questions perti- nent to the issue, or any other fact in his past life which might contradict any statement made by witness, or in any way tend to impair his credit, except the mere facts elicited in reference to the women referred to.    I think the court would have wisely exercised its discretion in excluding the evidence.   But on cross-examination the court must be allowed considerable latitude of discretion in permitting questions calculated to elicit any information as to the past life and conduct of the witness, and to enable the jury to see " what manner of man he is;" and we cannot, there- fore, say that it was error in law to permit these questions.— See *Comstock v. Smith, 20 Mich., 338.*

*30th assignment:* Wheaton, who was sworn for the defense, testified on his cross-examination, in reference to his going to Three Rivers (as spoken of by plaintiff's wit- ness); said he had no particular object in going there; had two Calvert notes of two hundred dollars, and one for one hundred and fifty dollars; got one of the notes of Knight, Sunday morning; was not long in making the trade, only a few minutes; got the note in the morning, and started for Schoolcraft in the afternoon.

He was then asked: " What did you do with your two hundred dollar notes ?"    Objected to ; objection overruled. Answer: "I disposed of them that day for a span of horses; Knight was with me.  I had one Calvert note left. Knight and I started for Lawton, Monday morning; that is the day Knapp's horses were got.    Tuesday morning we

went to Lawton. I went to Lawton and Mattawan for the purpose of seeing what the chances were of the road being built, and my getting work." [It appears from the evidence that he was a R. R. engineer.] Question : "Was there any committee appointed to employ an engineer?" Objected to as immaterial; objection overruled. Answer : "There was not to my knowledge." Question : "Did you confer at that meeting, about being employed as an engineer?" Objected to ; objection overruled. Answer : "With no one, I think ; won't be positive." Question : "Did you get rid of your one hundred and fifty dollar note that day ?" Objected to ; objection overruled. Answer : "I did not try to use it, particularly." Question : "Did you try to use it at all ?" Objected to; objection overruled. Answer : "I made no effort at all."

So far as these acts of Wheaton, in reference to the Calvert notes, and trading them off for property, are concerned, they were admissible, as already explained. So far as relates to Wheaton's efforts to get employment by the railroad, the questions were admissible for the purpose of showing that this was a mere pretense, and that he went to Lawton and Mattawan for the purpose of trading off these notes. But if the answers had no tendency of this kind, they were perfectly harmless to the defendants, and could not probably prejudice them.

*32d and 33d assignments of error :* Witness Merrill, who had testified on the part of the defendants, in reference to a trade made between him and the plaintiff, by which the plaintiff let him have for a horse the three hundred dollar note he got of the defendants, which trade was almost immediately rescinded, and the note and horse re-exchanged; and that Calvert, in the fall of 1869, wanted to sell the witness a part of his patent right ; and also testified to the value per acre of the Calvert farm, subject to the widow's life interest (which was the whole subject of his direct examination), testified, on his cross-examination, that he had had two or three of these Calvert notes, which

28 MICH.—10.

he got within a week after they were given; and that he did not know of these notes going to Three Rivers; that he knew Mr. French, of Three Rivers; had a letter from him. He was then asked: "What was it about?" This being objected to, and the objection overruled, he answered: "I have had a great many letters from him." Question: "Did you have a letter from him in April or May, 1869? and if so, what was it about?" Like objection to this; objection overruled. Answer: "I had a letter every week nearly, in regard to lumber." Question: "Did you get any letter from him in which any thing was said by him about Calvert notes?" Objection as before,—overruled. Answer: "I think I did."

Now, whether this last question was admissible on cross-examination, or not, it is perfectly evident that the answer elicited nothing which could possibly injure the defense, and it cannot, therefore, be treated as error.

The same witness, on his further cross-examination, having testified that he let different persons have some of the Calvert notes, was asked: "What did you get for these Calvert notes?" which was objected to, and the objection overruled; he answered: "I got a horse for it. Let Stuart have one of two hundred dollars for a couple of colts. Let Herman Kohl have one."

As there was nothing in the direct examination about the same matter, and as the question was not calculated to elicit any thing tending to show that the witness was connected in any common design with either of the defendants, in disposing of or trading in these notes, I think the objection was well taken, and the question inadmissible. It is hard to discover how the answer could prejudice the defense; but, we can hardly say with certainty that it might not have affected the credit of the witness before the jury, as in their minds showing a bias in favor of the defense. And though the point is not very clear, I am inclined to think this was error.

The 34th assignment, and part of the 35th, refer to the

form of declaration, the misjoinder of counts etc., and have already been disposed of. As to the balance of the 35th assignment of error, we think the court properly modified that part of the defendant's fourth request which asked an instruction that the action of trover could not be maintained, unless the jury were satisfied from the evidence "that the defendants *knew* the representations to be false," by adding "that they believed them to be false, or that they made them recklessly without any knowledge or belief as to the truth of what they represented, intending to deceive and defraud the plaintiff." In immediate connection with this, we will consider the 36th and 37th assignments of error, which present substantially the same question.

The court further charged that "if one obtains the property of another by means of untrue statements, though in ignorance of their falsity, he must be held responsible as for a legal fraud, though ignorant of the facts, if he had an evil intent when he made them,—if he intended to deceive the party; but if he made these representations in the honest belief that they were true, and it then turns out that they were false, and the [other] party suffers by it, then he would not be liable in an action for deceit. Suppose, for instance, that I had a note against one of your number, and I attempt to negotiate that note, and I have no knowledge whatever as to whether you are solvent or insolvent, and I know that, in order to induce the party to whom I intend to negotiate it, to receive it, I must give him to understand that you are good; I am not warranted in stating that you are perfectly good, and that the note is perfectly good, unless I have had some information upon that subject; for it is impossible for any man to entertain a belief, without there is some testimony, some evidence brought to his mind inducing that belief. If a man says, I believe a man to be sound, I believe him solvent, I believe a note good, when he has no testimony whatever on that point, he has stated an untruth, and there is a fraud; and if it turns out that it is false, and the other party suffers

by it, he is liable, just as liable as he would be if he knew the man to be worthless."

We think this charge, taken together—as the jury must be supposed to have taken it—is correct in principle as applicable to the evidence in the case, and lays down substantially the same principle in reference to fraud, as recognized by this court, in *Converse v. Blumrich*, *14 Mich.*, *109*. It certainly is not necessary, in order to maintain an action for the deceit in making false representations, upon the faith of which another party has acted, to show that the party making them knew them to be' false, if made for a fraudulent purpose (*Taylor v. Ashton*, *11 M. & W.*, *401*); and if a party recklessly makes a false representation, of the truth or falsehood of which he knows nothing, for the fraudulent purpose of inducing another, in reliance upon it, to make a contract, or do an act to his prejudice, and the other party does so rely and act upon it; the party making the representation is liable for the fraud, as much as if he had known it to be false. Such, upon principle, we think the law should be, and we understand it to be thus settled by the weight of the modern authorities. This will sufficiently appear by the authorities cited in the brief for the defendants in error. This principle applies equally whether the case be tried in a court of law or of equity.

And we understand the charge as intended to embody this view of the law.

We do not think the charge open to the objection made by counsel, that the jury might have understood the charge as saying, that if the representations were false, the defendants were guilty of fraud, though they made them with a full belief of their truth, and with an honest motive.

This case does not raise the question whether a party can be held liable for a fraud, for a statement or representation which is false in fact, and uttered for a fraudulent purpose, which it has accomplished, though believed by the utterer to be true when he made it.

For the two errors we have found in the record, though upon comparatively minor questions, the judgment must be reversed, and a new trial awarded.

The other Justices concurred.