# Bush *v*. Hartford Fire Insurance Company, Appellant.

*Insurance—Fire insurance—Conditions of policy—Waiver—Parol waiver—Proofs of loss.*

An insurance company may waive a compliance with any condition of a policy to be performed and observed by the insured, except when the insured by the act loses his insurable interest. The condition is

inserted in the policy for the benefit of the insurer, and hence there is nothing to prevent the company from waiving it whenever it may desire. This may be done expressly or by implication; and in either case the company thereafter cannot insist upon a performance of the condition. The law will not permit it to mislead or deceive the holder of its policy by any act or conduct on its part, and thereafter, to his detriment, insist upon full performance of a condition which it has waived.

An insurance company may waive a condition in a policy by parol although it contains a stipulation that there shall be no waiver of any condition except by an express agreement indorsed on the policy.

When an insured in good faith transmits to the insurer what he terms sufficient proofs of loss within the time required in the policy, it is the duty of the insurer, if such proofs for any reason are unsatisfactory, to promptly notify the insured, setting forth wherein the proofs do not comply with the conditions of the policy, and thereby give the insured an opportunity to rectify his mistake. Silence on the part of the insurer for any considerable time after the receipt of such proofs of loss, will be taken to be a waiver of the necessity for any further proofs of loss, and such proofs furnished by the insured will be held to be a compliance with the condition of the policy.

Where an insured sends his proofs of loss in due time and they remain in the possession of the company, and he receives no notice from the company of any objections to the proof nor that they are not in due form and in strict compliance with the policy, and he writes to the company asking if further proofs are desired, without receiving a reply, and interviews are had with the adjusters at which nothing is said about proofs of loss, a jury is justified in finding that the silence of the company until the bringing of the suit constitutes a waiver of the right to demand other or further proofs of loss.

Where an insured and the insurance company signed a nonwaiver agreement fifty days before the expiration of the sixty days within which proofs of loss were required to be filed, and the insured filed proofs of loss subsequent to the nonwaiver agreement and within sixty days of the fire, and the insurance company by its conduct showed that it does not require other proofs of loss to be filed, the nonwaiver agreement cannot be used to defeat the insured's allegation of waiver. In such a case as either party could waive his rights under the policy so he could do so under the contract.

*Insurance—Fire insurance—Stock of goods—Sale—Sole ownership.*

Where it appears that a person insuring a stock of goods obtained sole possession of them from their owner under an agreement under which he was required to replace them, if he sold them, or to pay the owner for them at a time specified in the agreement, and the previous owner had under the agreement no control whatever over the goods,

and no right to repossess himself of them, the insured has an "unconditional sole ownership" within the meaning of such words as used in a policy of fire insurance.

Argued Oct. 6, 1908. Appeal, No. 112, Oct. T., 1908, by defendant, from judgment of C. P. Armstrong Co., Sept. T., 1907, No. 150, on verdict for plaintiff in case of M. E. Bush v. The Hartford Fire Insurance Company of Hartford, Connecticut. Before MITCHELL, C. J., FELL, BROWN, MESTREZAT, POTTER, ELKIN and STEWART, JJ. Affirmed.

Assumpsit on a policy of fire insurance. Before PATTON, P. J.

The court charged in part as follows:

The dispute in this case arises, in the first place, under the sixty-seventh, sixty-eighth and sixty-ninth lines of the policy, where these words are found:

"If fire occur the insured shall give immediate notice of and loss thereby in writing to this company, protect the property from further damages, forthwith separate the damaged and undamaged personal property, put it in the best possible order, make a complete inventory of the same, stating the quality and cost of each article and the amount claimed thereon."

It was incumbent upon the plaintiff in this case to do that, and to show that he did comply with that requirement he testifies that on the day of the fire he gave notice to young Mr. McLaughlin, the son of the insurance agent, and that he visited the fire on the very day of the fire, and also that Mr. R. M. McLaughlin knew of the fire. Mr. R. M. McLaughlin, the old gentleman, testified that he knew of the fire the day it occurred. There is an act of assembly passed in Pennsylvania in 1883 for the benefit of the insured which simplifies the matter somewhat. That act of assembly sets forth that all that is necessary for the insured to do is to give notice to the local agent of the company within ten days of the fire, so that that was complied with in this case. We instruct you, first, that after the fire, the insured had to give immediate notice thereof in writing to this company. That, we instruct

you, has been complied with in the manner as we have stated. It was also his duty to protect the property from further damage, and separate the damaged from the undamaged property, but under the facts as shown in this case that could not be done, because it was a total destruction of the property. Then he was to make a complete inventory of the same, stating the amount and cost of each article and the amount claimed thereon. That he has attempted to do, as we will directly call your attention to.

It is not materially objected to that the plaintiff did not comply with that provision of the policy. The serious controversy here arises out of the provision beginning at line sixtynine in the policy, which is as follows:

"And within sixty days after the fire, unless such time is extended in writing by this company, shall render a statement to this company signed and sworn to by said insured, stating the knowledge and belief of the insured as to the time and origin of the fire, the interest of the insured and of all others in the property, the cash value of each item thereof and the amount of loss thereon, all encumbrances thereon, all other insurance, whether valid or not, covering any of said property, and a copy of all descriptions and schedules in all policies."

The policy provides for a number of other matters which we need not read to you. We instruct you, gentlemen, that the plaintiff, under the law, did not literally comply with that provision of the policy, that he did not comply with it according to law, and if there was nothing else in the case it would be your duty to render a verdict in favor of the defendant, because we instruct you as a matter of law that he did not comply with that provision of the policy which we have read to you.

The matter which will be for your consideration is this: Did this company, acting through its agents and representatives, so mislead and lull into security this plaintiff from making a strict compliance with the terms of the policy, that on account of being misled and being lulled to sleep by the conduct and actions of these agents, he failed to comply with this

provision? If you believe from the testimony and under the instruction that we will give you that they waived a compliance of this part of the policy, then the plaintiff could recover, notwithstanding the fact that he did not comply with the written terms.

In regard to that you have, first, the meeting on February 13. That was ten days after the fire. Mr. Chapman, who was special agent of the Hartford Fire Insurance Company for Western Pennsylvania, with a certain Mr. Young, came there upon the premises and visited the ruins. They had a talk there with Mr. Bush, in which they asked him in regard to this fire. He told them about this agreement with Mr. Beighley, and they said to him that that would ball up the whole affair. Bush says they requested him to send that agreement and they would adjust the loss; that they would come back as soon as they got the article, and that no complaint was made at that time about no proofs of loss being furnished, and that he was not asked to furnish any other. You have also the testimony of Mr. R. M. McLaughlin at that time, if I recollect the testimony, I believe it was with Mr. Chapman, but that is entirely for the jury, that Mr. Chapman said to Mr. McLaughlin that there would be nothing else to do but pay the loss, and Mr. McLaughlin says that he told Bush that, that he communicated that to Bush.

At that conversation it is also in evidence that after Mr. Bush had communicated to these agents the fact of this agreement with Beighley, what is called a nonwaiver agreement was entered into. That agreement reads as follows:

"It is hereby mutually understood and agreed by and between M. E. Bush, of the first part, and the American Fire Insurance Company, of Philadelphia, Penna., and other companies signing this agreement, parties of the second part, that any action taken by said parties of the second part in investigating the cause of the fire or investigating and ascertaining the amount of loss and damage to the property of the party of the first part, caused by fire alleged to have occurred on February 3d, 1907, shall not waive or invalidate any of the conditions of the policies of the parties of the second part, held

by the party of the first part, and shall not waive or invalidate any rights whatever of either of the parties to this agreement. The intent of this agreement is to preserve the rights of all parties hereto and provide for an investigation of the fire and the determination of the amount of the loss or damage, without regard to the liability of the parties of the second part. Signed in duplicate this 13th day of February, 1907. M. E. Bush, American Fire Insurance Co., by W. D. Strobel, Jr., Adjuster, per J. M. Young; Hartford Fire Insurance Co., by Hubert W. Chapman, Special Agent."

Then during that same conversation the testimony is that Mr. Young, who was with Mr. Chapman, appeared to do some talking and told Bush that when they got a copy of the Beighley agreement that they would proceed, but that without it they could not proceed with the adjustment. Gentlemen, you can take into consideration everything that occurred there that day between Mr. Bush on the one side, and Mr. Chapman representing the defendant corporation, and what was said by him, and what was said by Mr. Young in the presence of Mr. Chapman, and determine from that whether or not there was anything there to mislead Mr. Bush or to lull him into a sense of security in not furnishing those proofs of loss.

The next question that comes is this: There is some dispute in the testimony in regard to the date when these so-called proofs of loss were furnished to the defendant corporation. There is some testimony here that they were forwarded on March 15. There is an envelope offered in evidence which is postmarked on March 15. Mr. McLaughlin says that he mailed these so-called proofs of loss within a month or six weeks. Mr. Strobel, the agent, I believe, testifies that they were not received until March 24. Now, as we have instructed you, these so-called proofs of loss were not sufficient, and the jury can take this into consideration, that this defendant corporation, if it received those proofs of loss and retained them without making any objection to them, or saying that they were not complete, you can consider that with the other evidence in the case in determining whether or not the plaintiff in this case was lulled into a feeling of security.

Then we have the meeting, the date of which is disputed. Mr. Bush testifies that some time within the sixty days of the fire he received notice from Mr. McLaughlin, the local agent, to go to Pittsburg and see these people in regard to adjusting the loss. Mr. Bush states that he went to Pittsburg within the sixty days, and that he talked there with Mr. Strobel and Mr. Chapman, and that they said there that the only objection was as to this partnership agreement, and that nothing was said about the proofs of loss. Mr. Nelson was also present at that conversation, and he says that Mr. Strobel, in the presence of Mr. Chapman, said that the company was not liable, and that the policy should have been taken in the name of Beighley, and that there were no objections made as to the proofs of loss.

Now then, gentlemen of the jury, you can consider that, consider everything that was said by Mr. Bush and Mr. Nelson and Mr. Strobel and Mr. Chapman, and determine whether or not these parties waived a formal proof of loss, or if by their conduct, their actions and their declarations they misled Mr. Bush into believing that it was not necessary to furnish further proofs of loss.

The next matter we have on the part of the plaintiffs is the construction put upon this contract by their general agent. It seems, from the testimony offered in evidence, that on April 24, Mr. Guthrie, attorney for Mr. Bush, wrote the following letter:

"George L. Chase, President Hartford Fire Insurance Co., Hartford, Conn.

"Dear Sir: M. E. Bush, of Paulton, Westmoreland County, was insured in your Company under Policy No. 803 for $2,000 by R. M. McLaughlin and Company, Agents at Apollo, Pa. His store was burned February 3d, 1907, with all its contents. Proofs of loss were furnished by the assured to R. M. McLaughlin, Agent, and by him transmitted to your representative at Pittsburg, George W. Chapman, who visited Paulton several weeks ago for the purpose of adjusting the loss. The matter has not yet been adjusted. If you desire any further informa-

tion or additional proofs of loss kindly advise me and the same will be furnished.

> "Very truly yours,
> "WALTER J. GUTHRIE,
> "Attorney for M. E. Bush."

To that letter an answer was made on April 29, 1907, which is as follows:

"Walter J. Guthrie, Attorney, Apollo, Penna.

"Dear Sir: We have your favor of the 24th inst. addressed to President Chase, in reference to claim of M. E. Bush under policy No. 803. We have written to Pittsburg to-day to get further information regarding this matter, and when we do we will advise further.

> "Very truly yours,
> "FREDERICK SAMSON. Gen. Agent."

Then again on April 30, 1907, this letter was sent to Mr. Guthrie:

> "HARTFORD, April 30th, 1907.

"Walter J. Guthrie, Attorney, Apollo, Penna.

"Dear Sir: Referring again to your communication of the 24th inst. will say that the claim under our policy No. 803 has been put into the hands of Mr. W. D. Strobel, Jr., No. 309 4th Avenue, Pittsburg, Penna., for answer.

> "Yours very truly,
> "FREDERICK SAMSON, Gen. Agent."

Then the next communication in relation to this matter is the following:

> "HARTFORD, May 2d, 1907.

"W. D. Strobel, Jr., Pittsburg, Pa.

"Dear Sir: I have your communication of April 30th, in reference to the M. E. Bush claim at Apollo, Pa., agency, and note your remarks in reference to the matter. This is the claim in reference to which we sent a letter from a lawyer within a day or two. I have read very carefully the copy of the contract between Mr. Bush and the owner, Mr. J. H. Beighley. It

strikes me after reading the agreement that it is no more or less than the renting of the store. To be sure, there was a valuation of goods which were evidently rented, amounting to $25. We should feel that if this matter should go into court Mr. Bush would be declared owner of the property. Certainly if he has $6,000 to $8,000 involved in this business, and under the contract as between him and the owner of the real estate there is a rental of only $25, I don't think a jury would consider the question a minute. They would simply say he owns the stock, pay the loss. I should advise if the loss is straight and honest, making a settlement. I don't think we have a ghost of a show in court unless you have something else to stand on aside from the contract between these parties. I should advise going on to the ground and settling the loss in some way. If a compromise can be gotten out of it we shall not object to it. If it is an honest loss and the man has the property he claims, it looks to us like a total loss.

"Yours truly,

"FREDERICK SAMSON, Gen. Agent."

[Now, although that letter is written after sixty days had expired you can consider it with the other evidence in the case, in regard to the conduct and actions of the agent in resisting the payment of this loss after receiving that letter from the general agent of the defendant company.] [5]

On the part of the defendant there is testimony that is for your consideration here of Mr. Strobel. If I understood his testimony, these proofs of loss did not come into his hands until after the sixty days were passed. If that is so, it would not be binding on the defendant corporation. [You will also consider that on February 13, at the time that these men had this conversation with Mr. Bush, that he signed what is known as a nonwaiver agreement. After that was signed, anything said by these men would not be a waiver, but you can consider what was said before this nonwaiver agreement was signed.] [4] In regard to this conversation that occurred in the forepart of April both Mr. Strobel and Mr. Chapman testify that that conversation was on April 15. If that was the case then it

would be after the sixty days was up, and anything that was said then would not be binding on this defendant company as a waiver of proofs of loss. There is a dispute in the testimony which the jury will have to reconcile as best you can. Mr. Chapman and Mr. Strobel say that that conversation occurred on April 15, 1907, while Mr. Nelson and Mr. Bush say it took place in the latter part of March or the first of April, or early part of April. If it occurred after the sixty days then the jury could not consider it on the question of waiver. If it occurred within the sixty days then the jury could consider it on the question of waiver.

[You also have the testimony of Mr. Young and Mr. Chapman as to the conversation that took place with Mr. Bush on February 3. You also have the testimony of Mr. Chapman and Mr. Strobel as to the conversation that took place at this second meeting. The witnesses differ somewhat in details as to what the conversation was, and it will be for the jury to reconcile the testimony as best you can. You will take the testimony as a whole, and determine whether or not by the actions and conduct of the agents of the defendant company they waived a strict compliance with the terms of this policy of insurance, whether or not they so conducted themselves as to lead Mr. Bush into a false belief that a strict compliance with the conditions of this policy would not be required.] [6]

Gentlemen of the jury, there is another defense set up by this defendant. In the sixteenth and nineteenth lines of the policy it is set forth as follows:

"If the interest of the assured be other than the unconditional and sole ownership then this policy shall be void."

Now the defendant company alleges that Mr. Bush was not the sole owner of this property, and to substantiate that defense the following agreement was offered in evidence:

"Article of Agreement made this 1st day of March, 1904, between J. H. Beighley of the first part and Bush and Crawford of the second part. Witnesseth: That the said party of the first part does hereby lease and let unto the said parties of the second part from the 1st day of March, 1904, for the term of two years, for the yearly rental, three hundred dollars,

payable in monthly installments of twenty-five dollars each, the following described property, namely, the two-story frame store building, including ware room and sheds, situated in the village of Paulton; also his entire stock of goods and fixtures contained in said store building amounting to $2,500, together with horse, harness and wagon valued at $     . The party of the first part agrees to relet the said building and stock unto the said parties of the second part at the expiration of this lease for a term of one, two, three, four or five years at the same rental and on the same terms. The party of the first part agrees to give the party of the second part ninety days' notice should he wish them to quit at the expiration of this lease, and the said second parties agree to give the said first party ninety days' notice should they wish to quit at the expiration of the lease. The said second parties agree to leave the building in as good condition as at the time of leasing, damage by fire and the natural wear of the building excepted. The party of the first part agrees to take the entire invoice and turn over all papers should the said second parties decide to quit at the expiration of this lease. Should the amount of invoice be less than that at which it was taken, then the said second parties agree to pay the said first party the difference in cash. The party of the first part agrees to sell at the amount of this invoice to the parties of the second part at any time said second parties decide to buy. In the event of the parties of the second part buying said invoice, then the party of the first part agrees to rent the said building to the parties of the second part for a term of two years at the monthly rental of fifteen dollars. The said second parties are given the privilege of again renting said building for term of one, two, three, four or five years at the expiration of said term. The party of the first part agrees that he will not engage in the store business during the life of any lease with the parties of the second part within a radius of two miles of Paulton.

"J. H. Beighley,
"Bush and Crawford,
"M. E. Bush,
"M. M. Crawford."

[Gentlemen of the jury, in regard to that paper we instruct you as a matter of law that Mr. Bush was sole and unconditional owner of the property and comes within the requirements of that part of the contract. Although the parties used the word "lease" and "let," yet in our opinion that paper did not constitute what is known in law as a bailment, and Mr. Bush was the sole owner of the property at the time he effected the insurance.] [3]

On the part of the defendant we have been asked to answer the following point:

1. That under the law and all the evidence in the case the verdict of the jury should be for the defendant.

That point is refused, but we reserve the question with the privilege of entering judgment non obstante veredicto.

Gentlemen, the main question before you is this: Did these agents of this insurance company waive a strict compliance with the terms of this policy in regard to the proofs of loss, or did they so conduct themselves as to mislead Mr. Bush into not strictly complying with the terms of the policy. If the jury believes that they did, then your verdict should be in favor of the plaintiff for the sum of $2,000, with interest from sixty days after proofs of loss were waived, say interest from June 3, last. But if you find that these agents did not mislead Mr. Bush, that he was not lulled to sleep by their conduct, and that they did not waive a strict compliance with the terms of the policy, then your verdict should be in favor of the defendant company.

Verdict and judgment for plaintiff for $2,060. Defendant appealed.

*Errors assigned* were (3–6) above instructions, quoting them.

*W. K. Jennings,* with him *Dale C. Jennings* and *Ross Reynolds,* for appellant.—If the nonwaiver agreement means anything it means that nothing done by the parties should be considered a waiver: Desilver v. Ins. Co., 38 Pa. 130; Freedman v. Insurance Co., 175 Pa. 350.

The insured could not have been misled in the present case.

If the alleged denial of liability occurred before the expiration of the sixty days the company was protected by the nonwaiver agreement; if it occurred after that time the plaintiff's day of grace had expired and nothing but the express agreement of the company could renew or revivify the contract.

The plaintiff did not have the sole and conditional ownership of the goods: Schroedel v. Humboldt Fire Ins. Co., 158 Pa. 459; Bateman v. Lumbermen's Ins. Co., 189 Pa. 465; Mt. Leonard Milling Co. v. Liverpool & London & Globe Ins. Co., 25 Mo. App. 259; Duda v. Home Ins. Co., 20 Pa. Superior Ct. 244; 2 Clement on Fire Ins. 170; Phœnix Ins. Co. v. Public Parks Amusement Co., 63 Ark. 187 (37 S. W. Repr. 959); Ehrsam Machine Co. v. Phœnix Ins. Co., 43 Neb. 554 (61 N. W. Repr. 722); Westchester Fire Ins. Co. v. Weaver, 70 Md. 536 (17 Atl. Repr. 401); Lasher v. St. Joseph Fire, etc., Ins. Co., 86 N. Y. 423; Kompa v. Fire Ins. Co., 28 Pa. Superior Ct. 425; Elliott v. Teutonia Ins. Co., 20 Pa. Superior Ct. 359; Rowe v. Sharp, 51 Pa. 26; Stadtfelt v. Huntsman, 92 Pa. 53.

*J. W. King,* with him *W. J. Guthrie,* for appellee.—Waiver of proofs of loss is a question for the jury to decide: Oswalt v. Insurance Co., 175 Pa. 427; Southern B. & L. Assn. v. Insurance Co., 23 Pa. Superior Ct. 88; Sutton v. Insurance Co., 188 Pa. 380; Cummins v. Insurance Co., 197 Pa. 61; Davis Shoe Co. v. Insurance Co., 138 Pa. 73; Moyer v. Sun Ins. Office, 176 Pa. 579; Earley v. Insurance Co., 178 Pa. 631; Hower v. Insurance Co., 9 Pa. Superior Ct. 153; Davidson v. Guardian Assn. Co., 176 Pa. 525; Freedman v. Fire Assn., 168 Pa. 249; Snowden v. Insurance Co., 122 Pa. 502.

Appellee was the sole and unconditional owner of the property: Gillespie v. Iseman, 210 Pa. 1; Kronk v. Insurance Co., 91 Pa. 300; Phila. Tool Co. v. Assurance Co., 132 Pa. 236; McKeesport Machine Co. v. Insurance Co., 173 Pa. 53.

Possession and acts of ownership are prima facie evidence of ownership: Franklin Fire Ins. Co. v. Chicago Ice Co., 36 Md. 102; Winnesheik Ins. Co. v. Schueller, 60 Ill. 465; Swingle v. Sun Ins. Office, 33 Pa. Superior Ct. 261.

OPINION BY MR. JUSTICE MESTREZAT, January 4, 1909:

It is well settled that an insurance company may waive a compliance with any condition of a policy to be performed and observed by the insured except, as it has been held, when the insured by the act loses his insurable interest. The condition is inserted in the policy for the benefit of the insurer, and hence there is nothing to prevent the company from waiving it whenever it may desire. This may be done expressly or by implication; and in either case the company thereafter cannot insist upon a performance of the condition. The law will not permit it to mislead or deceive the holder of its policy by any act or conduct on its part, and thereafter, to his detriment, insist upon full performance of a condition which it has waived. As said by Chief Justice CHURCH in Brink v. Hanover Fire Insurance Company, 80 N. Y. 108: "Every consideration of public policy demands that insurance companies should be required to deal with their customers with entire frankness. They may refuse to pay without specifying any ground, and insist upon any available ground; but, if they plant themselves upon a specified defense, and so notify the assured, they should not be permitted to retract after the latter has acted upon their position as announced, and incurred expenses in consequence of it."

In Freedman v. Fire Association, 168 Pa. 249, this court, in an opinion by our Brother FELL, said (p. 254): "The trend of our decisions has been to hold insurance companies to good faith and frankness in not concealing the ground of defense and thus misleading the insured to his disadvantage. They may remain silent except when it is their duty to speak and the failure to do so would operate as an estoppel; but having specified a ground of defense, very slight evidence has been held sufficient to establish a waiver as to other grounds."

It is also settled law that an insurance company may waive a condition in a policy by parol although it contains a stipulation that there shall be no waiver of any condition except by an express agreement indorsed on the policy. This rule is stated as follows in 16 Am. & Eng. Ency. of Law (2d ed.), 935, with a citation of authorities sustaining it: "This rule (permit-

ting the waiver of a condition by parol) applies notwithstanding stipulations in the policy that nothing less than an express agreement indorsed on the policy shall be effectual for that purpose, since such a stipulation is itself a condition and is as capable of being waived or dispensed with as any other condition of the instrument, and since parties to contracts cannot so tie their wills as to be unable thereafter to do by consent what the law allows." And in 19 Cyclopedia of Law & Procedure, 777, it is said: "Even a stipulation that the conditions of a policy cannot be waived, or if waived at all only in a certain manner, may itself be waived." Nor can an insurance company after alleging or setting up a certain breach of the policy as a forfeiture be permitted subsequently to defend an action on the policy on the ground of different or other breaches of the contract. It has been generally held that if the insurer after a loss has occurred claims a forfeiture for noncompliance with certain conditions of the policy, it cannot be heard afterward to assert further or different breaches as a defense: 19 Cyclopedia of Law & Procedure, 793; Western, etc., Pipe Lines v. Home Insurance Company, 145 Pa. 346.

Another well-settled principle, applicable to the case in hand, is that when the insured in good faith transmits to the insurer what he terms sufficient proofs of loss within the time required in the policy, it is the duty of the insurer, if such proofs for any reason are unsatisfactory, to promptly notify the insured, setting forth wherein the proofs do not comply with the conditions of the policy, and thereby give the insured an opportunity to rectify his mistake. Silence on the part of the insurer for any considerable time after the receipt of such proofs of loss, will be taken to be a waiver of the necessity for any further proof of loss, and such proofs, furnished by the insured, will be held to be a compliance with the condition of the policy. In Gould v. Dwelling-House Insurance Company, 134 Pa. 570, the present chief justice, delivering the opinion, formulates the rule from our decisions on this subject as follows (p. 588): "If the insured, in good faith, and within the stipulated time, does what he plainly intends as a compliance with the requirements of his policy, good faith equally requires

that the company shall promptly notify him of their objections, so as to give him the opportunity to obviate them; and mere silence may so mislead him to his disadvantage, to suppose the company satisfied, as to be of itself sufficient evidence of waiver by estoppel." This rule has since been approved and enforced in many cases, the more recent of which are Welsh v. London Assurance Corporation, 151 Pa. 607; Moyer v. Sun Insurance Office, 176 Pa. 579.

Under the facts, as they appeared at the trial, and the law applicable thereto, it was a question for the jury to determine whether the defendant company had by its action and conduct waived any further proofs of loss than those furnished by the plaintiff. It is apparent throughout the case that the plaintiff acted with the utmost good faith towards the defendant company in regard to his loss. Immediately after the fire, he notified the local agent who countersigned the policy of the loss, and at the plaintiff's suggestion the agent at once notified the company. This notice was on a form furnished by the company for that purpose; and hence was in due form and conveyed to the company the necessary information concerning the fire. The company evidently acted upon this notice because within a few days thereafter its own special agent, Chapman, with the adjuster of the American Fire Insurance Company, which also had an insurance of $2,000 on the same property, appeared at the scene of the fire. Shortly thereafter, on the same day, these agents of the companies had an interview with the plaintiff in a local hotel. The company's local agent at Apollo testified that on this occasion Chapman "admitted that it was a total loss; he talked very reasonably about it, and I supposed that there would be nothing else to do but to pay it unless something else turned up." From the testimony, it is apparent that the loss would have been adjusted then and there had it not been for an incidental remark of the plaintiff that he still owed $2,000 on the goods which had been consumed by the fire. The plaintiff testifies that when the adjusters learned this fact, they declined to proceed further with the adjustment until they had a copy of the contract between the plaintiff and Beighley, from whom he had

procured the goods, and that they then said they would "come back and complete the adjustment." So far as appears from the evidence, nothing was said at this interview about the proofs of loss or that any would be demanded. The plaintiff, however, in about a month thereafter, had prepared an inventory or statement in detail of the goods destroyed, verified by the affidavits of himself and the clerk who assisted him in making the inventory, and then handed it to the local agent of the defendant company by whom it was, on the same day, sent to one of the adjusters at Pittsburg, where Chapman, the special agent of the defendant company, saw and had access to it. The company failed to notify the plaintiff of any objection to this proof of loss, or in any way to intimate to him that it was not satisfactory and in conformity with the requirements of his policy. So far as he knew, therefore, he had complied with the condition of his contract requiring him to furnish proofs of loss and had no reason to believe that the proofs furnished were in any respect objectionable to the defendant. Again, and within sixty days from the time of the fire, the plaintiff with a friend, at the request of Chapman, met him and Strobel, the adjuster of the American Fire Insurance Company, at the latter's office in Pittsburg "for the purpose (as stated by Chapman) of ascertaining if Bush would agree to an offer of compromise settlement." The conversation at this interview related entirely to the plaintiff's loss and offer of compromise by Chapman. Not a word was said by either of the adjusters in regard to the proofs of loss or that they were insufficient or did not comply with the conditions of the policy. A compromise was suggested on the part of the adjusters on the basis of the satisfaction of the claim on payment of one-half of the amount of the insurance. The plaintiff at once declined to accept the proposition and insisted upon the payment of the full amount of the policy.

On April 24, 1907, Bush's attorney wrote the defendant company stating that his client held their policy for $2,000 on his goods; that they had been totally destroyed by fire; that proofs of loss had been furnished; that its agent had visited Paulton several weeks prior thereto to adjust the loss, that

the matter had not been adjusted, and concluding: "If you desire any further information or additional proofs of loss kindly advise me and the same will be furnished." The company's general agent replied on April 29, acknowledging receipt of the letter and saying he had written to Pittsburg for further information and would advise further. The next day, the general agent again wrote in reply that the claim had been put in W. D. Strobel's hands for answer. No objection to the proofs of loss was made in the replies of the company's agent nor an intimation of any defense to the claim.

If these several facts were established, of which there was ample proof to go to the jury, the jury was fully justified in finding that the defendant company did not intend to insist upon further proofs of loss than those furnished by the plaintiff. It is manifest, we think, that the loss would have been adjusted at the first interview on February 13, if nothing had been said about the indebtedness of the plaintiff to Beighley and the contract under which he held the goods. A further consideration of the adjustment, if the evidence is believed, was postponed by the adjusters simply because of the doubt arising in their minds of the right of the plaintiff to recover by reason of his not being the sole owner of the goods which were insured. The same objection to the claim, although manifestly not regarded by them as substantial, was in the minds of the adjusters when the plaintiff subsequently met them at their request in Pittsburg to attempt a compromise. At that time the plaintiff had sent his proofs of loss and they were in the possession of the company. He had received no notice from the company of any objections to the proofs nor that they were not in due form and in strict compliance with the policy. The Pittsburg interview also passed off without any intimation on the part of the company or its agent that the proofs were not sufficient. The jury was therefore fully justified in finding that the silence of the company until the bringing of the suit was, under the circumstances, a waiver of the right to demand other or further proofs of loss. Under the authorities cited, the testimony clearly made the question one of fact for the jury, and the court properly submitted it.

It may well be admitted that the counsel for the plaintiff made a mistake when he advised his client to sign the nonwaiver agreement.  There was absolutely no necessity for this agreement, if the company intended to carry out in good faith its contract with the plaintiff.  The agreement was signed by the plaintiff when the adjusters came to the scene of the fire on February 13, at least fifty days before the expiration of the sixty days within which proofs of loss were required to be filed.  The interim was amply sufficient for the company to investigate the cause of the fire and ascertain the amount of loss, and to affirm or deny its liability.  There was, therefore, no necessity for an agreement "to preserve the rights of all parties," and the only effect of such an agreement was to supply the company with evidence to defeat the plaintiff's allegation of waiver.

But the agreement does not necessarily defeat the plaintiff's right to recover in this action.  It was simply a part of the evidence which was submitted to the jury to determine whether the defendant company had waived its right to insist upon other and more formal proofs of loss.  As pointed out above, aside from this agreement, the evidence was ample to justify the jury in finding that there had been a waiver of the proofs of loss.  The nonwaiver agreement was signed by the plaintiff on February 13.  It was subsequent to that date and within sixty days of the fire, that he furnished the proofs of loss to the company through the local agent.  By its conduct on the various occasions referred to in the evidence, did the defendant intend to waive its rights under the policy to require other proofs of loss, and was the evidence sufficient to warrant the jury in so finding?  If this agreement had been inserted in the policy in the first instance, instead of being made part of it by subsequent agreement, the defendant company could undoubtedly have waived all its rights thereunder.  This proposition is clearly supported by the authorities we have cited above.  The parties to this contract were the parties to the policy, and as either party could waive his rights under the policy, he certainly could do so under the contract.  Those who make a contract of insurance can, unless prevented by

law, unmake or avoid it, and either party may decline to insist upon the performance of stipulations made for his benefit. We therefore think the learned judge was right.in submitting it as a part of the evidence to the jury to determine the question whether the defendant company had waived its rights to insist upon more formal proofs of loss.

The other defense interposed by the defendant company to the plaintiff's action is that he was not the sole owner of the property insured.  The policy provides that it shall be void "if the interest of the insured shall be other than unconditional and sole ownership." The plaintiff held this property by a contract with one Beighley.  By the terms of that agreement, Beighley leased to Bush the store and also the goods contained in it.  The policy involved in this litigation covered the goods. The goods were delivered by Beighley to Bush for a term of two years with the privilege to the latter of retaining them for five years longer or purchasing them if he desired.  At the expiration of the lease, Bush was to pay Beighley the difference in the invoices taken at the time he received them and when they were redelivered to Beighley.  In the meantime, Bush had sole possession of the goods and the right to sell any or all of them, the difference between the value of the goods in the store at the time he took possession and when he relinquished possession to Beighley, at the end of the lease, being the price he had to pay.  Bush, therefore, by this contract between him and Beighley, obtained possession of the goods with the right to sell them, and was required to replace them or pay Beighley for them at the time specified in the agreement. He was required to pay at the end of his lease for the goods which the invoice, then taken, showed to have been sold by the plaintiff, whether it was all or a part of the goods.  As testified by Bush: "Mr. Beighley turned the goods over to me and I was to pay for the goods in goods or in cash, it didn't matter which." While the goods were in the possession of the plaintiff under the contract, Beighley had no control whatever over them and had no right to repossess himself of them. They were absolutely in the possession and control of the plaintiff and he had the right to dispose of them at any price

or any way he saw fit. At the time of issuing the policy insuring the goods and until they were destroyed by fire, it is manifest, we think, that under the contract with Beighley, the plaintiff's interest in the goods was an "unconditional and sole ownership" within contemplation of the policy. The learned judge was therefore right in so construing the contract.

We may appropriately conclude this opinion by quoting from a letter of the defendant's general agent to one of the adjusters on May 2, 1907, which shows the interpretation put upon this contract by the defendant company, and further, that if his advice had been taken the company would not now be attempting to defeat an honest claim by the baldest technicality. The letter reads: "I have read very carefully the copy of the contract between Mr. Bush and the owner, Mr. J. H. Beighley. It strikes me after reading the agreement that it is no more or less than the renting of the store. . . . We should feel that if this matter had to go into court Mr. Bush would be declared owner of the property. Certainly if he has from $6,000.00 to $8,000.00 involved in this business, and under this contract as between him and the owner of the real estate, there is a rental of only $25.00, I don't think a jury would consider the question a minute. They would simply say he owns the stock—pay the loss. . . . I don't think we have a ghost of a show in court unless you have something else to stand on aside from the contract between these parties. I should advise going on to the ground and settling the loss in some way."

The judgment is affirmed.