SUN LIFE ASSURANCE COMPANY OF CANADA *v.* ALLEN.

1. INSURANCE—APPLICATIONS—INTOXICATING LIQUORS—FALSITY AND MATERIALITY OF REPRESENTATIONS.

   A representation in an application for a life insurance policy that applicant did not use intoxicating liquors to excess when in fact he was a drunkard *held,* fraudulent and to have materially affected the risk and hazard assumed (3 Comp. Laws 1929, § 12444).

2. SAME—MISREPRESENTATIONS AFFECTING RISK OR HAZARD ASSUMED —INTENT.

   If misrepresentations in an application for a life insurance policy materially affect the risk or the hazard assumed, it is unnecessary to show they were intentional.

3. APPEAL AND ERROR—FINDING OF FACT—EQUITY—REVIEW.

   Upon an appeal to the Supreme Court in an equity case, the scope of the review of findings of fact is quite broad.

4. INSURANCE—FINDING OF COURT—PARTNERSHIP—INSURABLE INTEREST.

   In suit to cancel life insurance policies on life of partner after his death, record *held,* to disclose no reason for disturbing finding of trial judge that deceased never was a real partner and that partnership had no insurable interest in his life.

5. SAME—INSURABLE INTEREST OF PARTNER.

   The mere existence of a legal partnership does not establish an insurable interest but there must be a real concern in the life of the insured, such as where the success of the business is dependent upon the continuance of that life.

6. SAME—INSURABLE INTEREST IN SWEEPER AND FIREMAN OF BAKERY.

   Fact that deceased insured was taken into firm to avoid labor troubles *held,* insufficient to show that partnership had insurable interest in his life where his duties, when sober, were to sweep the floors and tend the fires of bakery.

7. SAME—APPLICATIONS — COUNTERSIGNATURE BY INSURED PARTNER
   —PAYMENT OF PREMIUMS.

   Countersignature of application for life insurance policy by in-
      sured partner *held*, not to amount to procurement of such
      insurance by him where another partner signed the application
      and paid the premiums on the policy in which partnership was
      beneficiary.

8. EVIDENCE—SIMILAR ACTS — ADMISSIBILITY — REMOTENESS — PRE-
   SUMPTIONS.

   The test as to whether evidence of a similar act is admissible is
      whether the earlier act was sufficiently near in point of time
      to permit a presumption to arise therefrom that the motive
      which it is sought to establish then existed.

9. FRAUD—SIMILAR ACTS—EVIDENCE.

   In suit to cancel life insurance policies in which partnership
      was beneficiary, claim of scheme to defraud insurer *held*, sup-
      ported by evidence that two other partners had died within
      about five years of death of one insured in policies of which
      cancellation is sought and that policies in all three instances
      had been in force less than three years, since the admissibility
      of testimony as to such prior transactions is not measured
      solely by the calendar, the nature of the fraud and the cir-
      cumstances in each particular case are to be considered.

10. INSURANCE—FRAUD—EVIDENCE.

    In suit to cancel life insurance policies on ground of fraud, clear
       and convincing proof of scheme to defraud *held*, established
       by evidence other than that of two similar instances occurring
       within a period of about five years.

11. STATUTES—CONSTRUCTION—EXCEPTIONS.

    Construction of statute providing that life insurance policy shall
       be incontestable after it shall have been in force during the
       lifetime of the insured for two years from its date, with cer-
       tain exceptions, falls within the rule that inclusion of excep-
       tion excludes everything else.

12. INSURANCE — INCONTESTABILITY   CLAUSE — APPLICATION — CON-
    STRUCTION.

    Claims by insurer, that life insurance policy resulted from in-
       tentional fraud in application as to applicant's health and
       that beneficiary had no insurable interest, advanced in suit
       to cancel policies *held*, contests required to be made while
       policy was in force during lifetime of insured and within two

years from its date but available to insurer where insured died within two-year period although suit was not commenced until after its expiration (3 Comp. Laws 1929, § 12427).

13. Same—Joint Policy—Incontestability Clause.

Claim that incontestable clause in joint policy insuring the lives of two partners is available as bar to insurer's claim of fraud while one of the insured is still living *held*, without merit where one of the insured died before expiration of two years from date of policy thus causing it to cease to be "in force" within meaning of statute (3 Comp. Laws 1929, § 12427).

14. Same—Fraud—Waiver—Acceptance of Premiums—Estoppel.

Insurer *held*, not to have waived fraud involved in issuance of policy in favor of partnership which had no insurable interest in life of insured "partner" by acceptance of premiums on it after refusing to issue additional insurance, where such fraud is against public policy and beneficiary which paid premiums did not establish it was led to believe insurer had waived fraud by such acceptance since such waiver is not based upon contract but upon estoppel of insurer to insist on conditions of contract inconsistent with unconditional acceptance of premiums.

15. Equity—Cancellation of Life Insurance Policy.

In suit to cancel life insurance policies for fraud, court of equity will look at the whole situation and grant or withhold relief as good conscience dictates.

16. Same—Tender—Interest on Premiums.

In suit to cancel life insurance policies, requirement that insurer, as a condition of cancellation, return the premiums with interest to date of tender rather than to date of decree because of alleged defective tender, is affirmed, where tender was made of such premiums separately from those of other policies, not now involved in this suit.

17. Costs—Injunction—Bond.

Cost of bond required as a condition precedent to injunction restraining action at law on insurance policies here sought to be canceled, *held*, not a taxable item of costs where no action at law was then pending and Court Rule No. 5, § 7 (1933), was not in effect at time bond was executed.

Appeal from Wayne; Moll (Lester S.), J. Submitted October 11, 1934. (Docket No. 100, Calendar No. 37,907.) Decided January 29, 1935. Rehearing denied March 5, 1935.

Bill by Sun Life Assurance Company of Canada, a Canadian corporation, against Abe Allen, Charles Elson and Rubin Goodstein, individually and as co-partners doing business as the Hand Baking Company, for cancellation of life insurance policies. Cross-bill by defendants for sums due on policies. Decree for plaintiff. Defendants appeal. Affirmed.

*Walters, Carmichael & Head,* for plaintiff.

*Samuel Shimans* (*Joseph B. Beckenstein* and *John Sklar,* of counsel), for defendants.

Bushnell, J.   Sun Life Assurance Company of Canada on October 5, 1925, wrote insurance on the lives of Abe Allen and Lukash Cap in the sum of $25,000, payable to Hand Baking Company, a co-partnership, as beneficiary, and on January 6, 1926, issued a second policy on the same lives in the sum of $12,500, payable to the same beneficiary.   Lukash Cap died August 2, 1927, the cause given in the certificate of death as "hemorrhage following ruptured gastric ulcer; contributory; medical."   The death occurred within 17 hours after he was "wrestling" or "struggling" with Elson, in which encounter Elson "squeezed to the bench" his insured partner Cap.

Both policies contained the following provision:

"3.   *Incontestability.*   This policy is issued in consideration of the representations and agreements contained in the written application therefor, and together with such application, a copy of which is attached hereto and made a part hereof, shall constitute the entire contract between the parties hereto, and shall be incontestable after the policy has been in force during the lifetime of the assured for a period of two years from the date of issue, except for nonpayment of premiums.   All statements made

by the assured shall, in the absence of fraud, be deemed representations and not warranties; and no such statement shall void the policy unless it is contained in the said application, a copy of which is attached to this policy when issued.''

The certificate of copartnership of defendant company which bore the date of August 30, 1924, was not filed until September 15, 1925, that being the day following the one upon which the application for the first policy was executed by Cap and Elson. This certificate names the copartners as Charles Elson, Rubin Goodstein, Abraham Allen and Lukash Cap. Cap signed both the certificate and application by his mark.

The mortality among the partners of Charles Elson was rather high. Federowitz, a partner, died March 21, 1922, at the age of 33, of either lobar pneumonia or delirium tremens, with $27,500 of life insurance payable to Elson, Goodstein and Allen, for which application had been made on February 25, 1921. Stanislaus Bogacki, another partner, died at the age of 44 from a cause given in his death certificate as ''fall down stairs in home, fracture of skull, alcoholism,'' with $15,000 of insurance payable to the firm, the policy having been issued only three months after the death of Federowitz. Bogacki lived less than three years after his policy was issued. The record is silent as to Allen and Goodstein; all we know is they did not appear as witnesses in the instant case.

After the death of Cap, plaintiff refused to pay the amount of the policies, tendered repayment of the premiums, with interest, and demanded a return of all policies held by defendants. This tender and demand being refused, the insurance company filed a bill in equity on January 3, 1928, praying cancella-

tion, alleging fraud and false representations, and upon filing a bond in the sum of $40,000, secured an injunction restraining actions at law on the policies. Defendants answered and by cross-bill prayed that the policies be declared valid and that plaintiff be ordered to pay the full amount claimed to be due. During the trial plaintiff withdrew from its bill all policies of insurance except those on the joint lives of Cap and Allen. Defendants appeal from a decree which granted plaintiff the relief sought and which dismissed defendants' cross-bill.

The evidence supports the finding of the trial judge that Cap was a drunkard at the time of the application and continued to be one until his death. Mrs. Krowiak, who had known him since his childhood in Poland, summed up the matter when she testified, "he only didn't drink at the time he didn't have anything to buy it with." Defendants' chief witness Elson, and the one most interested in the litigation, somewhat reluctantly corroborated the testimony of Mrs. Krowiak and the other disinterested witnesses as to Cap's habits. The testimony of former employees of defendant company precludes any possibility of a lack of defendants' knowledge on this point. They must have known Cap was a drunkard and yet Elson signed an application in which he declared as to the applicant:

"That the life to be assured is now and usually in sound health; and agrees that this declaration, with the answers to be given by the life to be assured to the medical examiner, shall be the basis of the policy," etc.

Cap, in answer to the questions of the examiner, represented his health as perfect and in one application stated that his use of wine, spirituous or malt liquors was confined to "not over a glass weekly"

and in the other to "a glass of beer occasionally." The transactions were, in the words of the trial judge, "conceived in fraud," in that the habits of the insured were misrepresented to the company. The misrepresentations materially affected the result and it is not necessary to show they were intentional. 3 Comp. Laws 1929, § 12444, and *Krajewski v. Western & Southern Life Ins. Co.,* 241 Mich. 396.

While in equity the scope of the review of findings of fact is quite broad, *State* v. *Venice of America Land Co.,* 160 Mich. 680, our examination of the record discloses no reason for reversing the finding of the trial judge that:

"The story of Cap as disclosed by the testimony is at best sordid and tragic. Doubt can hardly exist as to his dissolute habits, nor as to the fact that he could have been of but little use to any business."

The evidence offered warrants the conclusion of the court below that Cap never was a real partner in the Hand Baking Company and that it had no insurable interest in his life. The mere existence of a legal partnership does not establish an insurable interest. As stated in *United Security Life Ins. & Trust Co.* v. *Brown,* 270 Pa. 270 (113 Atl. 446):

"To sustain a contract of this character, it must further appear that there is a real concern in the life of the party named, whose death would be the cause of substantial loss to those who are named as beneficiaries. This does not follow the cessation of ordinary service, but arises where the success of the business is dependent on the continued life of the employee."

See, also, *Mutual Benefit Ass'n of Michigan* v. *Hoyt,* 46 Mich. 473; *Warnock* v. *Davis,* 104 U. S. 775; *Connecticut Mutual Life Ins. Co.* v. *Luchs,* 108 U. S. 498 (2 Sup. Ct. 949); *Wurzburg* v. *New York Life*

*Ins. Co.,* 140 Tenn. 59 (203 S. W. 332, L. R. A. 1918 E, 566).

We have already indicated that the copartnership certificate was not filed until the day after the signing of the first application, and have commented on the absence of testimony by the partners except Elson. We find it impossible to hold that the partnership could have suffered so substantial a loss upon the death of Cap as to prefer his continued services to the insurance money. Everything points to the opposite conclusion. He had nothing to do with the management of the business; he was not an experienced baker; he had been employed in a stone quarry previous to his connection with the firm; his duties, when sufficiently sober, were to sweep the floors and tend the fires; he paid no money for a partnership interest valued at $20,000, but gave a note for $3,000 which was not produced at the trial; he had no interest in the firm real estate; Elson said he drew $50 a week but this was disproved by the bank records which also failed to show him as a partner. His landlady testified in answer to defendants' question:

"Didn't he tell you at that time that 'Now that I am a partner I don't have to go to work; I can work whenever I want to?'

"No, he said this to me, 'That he was not a partner, only a sweeper, and they had him insured only for this reason, to get money after his death.' "

Assuming that Elson was truthful when he said he took Cap in as a partner to avoid labor troubles, that would not be sufficient to show an insurable interest. Nor did Cap by countersigning the application procure the insurance himself. Elson signed the application, and paid the premiums for the copartnership. He was the moving spirit in the transaction and Cap was merely the stupid tool through which the fraud was perpetrated.

Defendants object to evidence introduced by plaintiff as to the insurance and death of Federowitz and Bogacki through which defendants collected large sums of money. They admit, however, that similar acts of misconduct may be shown where, as here, a fraudulent intent is alleged. See *Beebe* v. *Knapp,* 28 Mich. 53; *Stranahan* v. *Genesee County Farmers Mutual Fire Ins. Co.,* 242 Mich. 413; and *Bottomley* v. *United States,* 1 Story (C. C.), 135. But they argue that Mr. Justice NELSON SHARPE laid down the rule in the *Stranahan Case* that an interval of 20 months between the similar acts was too great. That case is not authority for such a conclusion, but rather for the proposition therein stated that, "the test seems to be whether the earlier act was sufficiently near in point of time to permit a presumption to arise therefrom that the motive which it is sought to establish then existed."

Mr. Justice STEERE, speaking for the court in *Krolik* v. *Lang,* 187 Mich. 286, held it was not error, in an action based upon an intent to deceive, to admit testimony as to the contents of the two financial statements claimed to be false and given prior to the one in question, and there said:

"It is an elementary rule that much latitude may be allowed in admission of circumstantial evidence in cases where fraud is charged (14 Am. & Eng. Enc. Law, p. 195; 20 Cyc. p. 110), 'and no rigid rule of evidence can be applied to measure the admissibility of circumstances, for they arise out of the condition, relation, conduct, and declarations of the parties, and those are infinitely diversified.' "

It is reasonable to infer that the Federowitz loot was probably used in part to insure Bogacki, and the only reason the Bogacki money was not available to pay for the Cap insurance was the delay occasioned by the litigation in *Bogacki* v. *Great-West*

*Life Assurance Co.,* 253 Mich. 253. It is obvious that
an insurance fraud of the nature here depicted can-
not be consummated within a short time. In this
case, however, the promptness with which the com-
mencement of each fraud followed the consummation
of the preceding one and the similarity of each fraud
to the others, indicates that all were but parts of a
continuing fraudulent scheme. The admissibility of
such prior transaction is not to be measured solely
by the calendar; the nature of the fraud and the
circumstances in each particular case are also to be
considered. But whether that evidence was admis-
sible or not, the other evidence in the case is suffi-
cient to constitute that "clear and convincing" de-
gree of proof required in these fraud cases. *Buck* v.
*Sherman,* 2 Doug. 176; *Bumpus* v. *Bumpus,* 59 Mich.
95; and 5 Wigmore on Evidence (2d Ed.), § 2498.

As to the $25,000 policy issued October 5, 1925,
defendant urges that since this action was not
brought until January 3, 1928, plaintiff's right to
assert fraud is barred by the incontestability clause,
more than two years having elapsed since the issu-
ance of the policy. Plaintiff's counsel argue that
this provision, though it bars the assertion of such
fraud as would otherwise make the policy voidable,
has no application in this case since, because of in-
tentional fraud and the lack of insurable interest, the
policy is completely void. In view of our recent de-
termination of this matter in the *Bogacki Case,*
*supra,* we are bound to hold the contention of no
avail. Mr. Justice Wiest there said:

"The shade between actual fraud and a violation
of public policy in life insurance contract relations
is not so pronounced as to justify application of the
statute to the one and not to the other. The statute
carries the only permissible exceptions to its bar and

its construction falls within the rule that the inclusion of an exception excludes everything else."

Plaintiff also argues that the incontestability provision is not applicable here because Cap died August 2, 1927, two months before the end of the two-year period. The clause in the policy is substantially in the words of the statute (3 Comp. Laws 1929, § 12427), which requires that it be inserted, the essential part of which reads:

"Shall be incontestable after it shall have been in force during the lifetime of the insured for two years from its date," etc.

The language of the amended statute requires that plaintiff's contention be sustained. We considered and denied the same contention in *Becker* v. *Illinois Life Ins. Co.,* 227 Mich. 388, where we followed the rule stated in *Mutual Life Ins. Co.* v. *Hurni Packing Co.,* 263 U. S. 167 (44 Sup. Ct. 90, 31 A. L. R. 102). But the statute which is quoted above and the one applicable in the present case differs from that in the *Becker Case.* The statute applicable in the *Becker Case* (Comp. Laws Supp. 1922, § 9100[147]), reads:

"Shall be incontestable after two years from its date," etc.

It was amended to its present form by Act No. 63, Pub. Acts 1923. The almost uniform holding is that where the provision requires that the policy shall have been "in force" or "in force during the lifetime of the insured" for a certain period, the death of the insured within the period forever bars its completion. *Jefferson Standard Life Ins. Co.* v. *McIntyre,* 285 Fed. 570; *Ætna Life Ins. Co.* v. *Kennedy* (C. C. A.), 31 Fed. (2d) 971; *Greenbaum* v. *Columbian National Life Ins. Co.* (C. C. A.), 62 Fed. (2d) 56; *Chicago*

*National Life Ins. Co.* v. *Carbaugh,* 337 Ill. 483 (169 N. E. 218); *McKenna* v. *Metropolitan Life Ins. Co.,* 220 App. Div. 53 (220 N. Y. Supp. 568), and annotations in 85 A. L. R. 234, 31 A. L. R. 108.

In *Thomas* v. *Metropolitan Life Ins. Co.,* 135 Kan. 381 (10 Pac. [2d] 864, 85 A. L. R. 229), where the provision was that the policy must have been "in force for a period of two years from the date of issue," the Kansas court held (although in a previous case, *Priest* v. *Kansas City Life Ins. Co.,* 119 Kan. 23 [237 Pac. 938, 41 A. L. R. 1100], where the policy was incontestable "after one year from date of issue," they had held that death of insured did not bar its operation) that in the present case death would bar operation, saying, by way of distinguishing the cases:

"In the policies before us, however, the incontestable clause is materially different in text and terms. They are to be incontestable after they have been in force for a period of two years from date of issue except for nonpayment of premiums. Ere that period elapsed, Thomas had died, and the obligation of the policies was thereby matured and transformed into a debt due from defendant to the beneficiaries, subject to whatever valid defenses could be effectively offered thereto. It is rather obvious, we think, that this incontestable clause contemplated that the insured should be alive and in good standing with the insurance company by payment of the requisite premiums regularly for the two-year period."

In seeming anticipation of our conclusion, defendants argue that even if we should hold, in ordinary cases, that the death of the insured before the expiration of the period bars application of the clause, we cannot do so here as the policy is a joint one insuring the lives of both Cap and Allen and Allen

is still alive. This argument is an empty one since the full amount of the policy became payable on the death of either. When Cap died, the policy was no longer "in force" within the meaning of the statute.

Waiver is asserted by reason of plaintiff's acceptance of premiums in October, 1926, and January, 1927, although it refused to issue additional insurance in April, 1926, after receiving an unfavorable report from investigators; and also because of the claim that the statute groups the lack of insurable interest with other types of fraud. Mr. Justice COOLEY in *Agricultural Ins. Co.* v. *Montague,* 38 Mich. 548 (31 Am. Rep. 326), in holding erroneous an instruction that lack of insurable interest had been waived, said:

"If the instruction was correct, it is manifest that any person may obtain insurance upon property without any right in it whatsoever; he has but to disclose the facts, and the policy, though only a wager policy, will be as legal as any other. But such a doctrine is at war with the fundamental principles of insurance, which require that a person shall have an insurable interest before he can insure: a policy issued when there is no such interest is void, and it is immaterial that it is taken in good faith and with full knowledge. The policy of the law does not admit of such insurance, however willing the parties may be to enter into it. The doctrine of waiver has obviously nothing to do with the case."

See, also, *Hirsch* v. *City of New York Ins. Co.,* 218 Mo. App. 673 (267 S. W. 51); *Firemen's Fund Ins. Co.* v. *Cox,* 71 Okla. 97 (175 Pac. 493); *Hartford Fire Ins. Co.* v. *Evans* (Tex. Civ. App.), 255 S. W. 487, 489 (where the reason given is that, "the principle prohibiting insurance in favor of one having no insurable interest therein is one of public policy"); *Wisecup* v. *American Ins. Co. of Newark,* 186 Mo.

App. 310 (172 S. W. 73) ; *Bush* v. *Hartford Fire Ins. Co.,* 222 Pa. 419 (71 Atl. 916).

Furthermore, defendants' proofs fail to establish that they were led to believe plaintiff had waived the fraudulent misrepresentations by their acceptance of the premiums. Defendants rely on *New England Mutual Life Ins. Co.* v. *LeVey,* 264 Mich. 282, 285, as showing that the facts here constitute waiver, but that case may be distinguished. There the insurance company sent notice of rescission for fraud to the insured and thereafter accepted payment of premiums. In the present case, as the insured had no knowledge that the insurance company had learned of the fraud at the time it accepted payment of premiums, the insured had no reason to assume from that fact that the insurance company intended to waive the fraud, for in order to constitute estoppel there must be something misleading to the insured (*Security Ins. Co.* v. *Fay,* 22 Mich. 467 [7 Am. Rep. 670]), and in this State the requirements of waiver seem to be as demanding as those of estoppel. *Ruddock* v. *Detroit Life Ins. Co.,* 209 Mich. 638; *Weller* v. *Manufacturers Life Ins. Co.,* 256 Mich. 532. In the latter case it is said:

"Waiver by acceptance is not based upon contract. It is that the company is estopped to insist on conditions of the contract inconsistent with unconditional acceptance of the premiums."

Upon receiving a report from the Retail Credit Company that Cap was not a desirable risk, plaintiff immediately notified the manager of its Detroit office. Manager Owen, reluctant to lose the business, suggested that an alternative report be obtained from R. G. Dun & Company. This was done and as the investigator for R. G. Dun & Company secured his information through an interview with Elson,

the report was very favorable. Plaintiff then obtained an alternative report from the Retail Credit Company which confirmed their first report. The evidence of fraud confronting the plaintiff was conflicting, and if, as plaintiff claims, they doubted the reliability of the Retail Credit Company report, Elson himself was the cause of that doubt. Though plaintiff did not know Elson was the source of R. G. Dun & Company's information, the following quotation seems applicable:

"As between himself and Converse, Blumrich had fully discharged his duty by making the inquiry; and the former will not be heard to claim that Blumrich should have received and acted upon the prior information, instead of the positive statements made by himself to the contrary. When one seeks the best authority to ascertain the truth of rumors, and is there misled, the person misleading him can hardly be allowed to support rights by insisting that he should still be chargeable with the reports which he had endeavored in vain to verify." *Converse* v. *Blumrich,* 14 Mich. 109, 121 (90 Am. Dec. 230).

Defendants' argument, that plaintiff is not entitled to equitable relief because of unclean hands and the other reasons assigned, must be rejected, for, as said by Mr. Justice WIEST:

"Equity looks at the whole situation and grants or withholds relief as good conscience dictates." *Thill* v. *Danna,* 240 Mich. 595.

In *Hess* v. *Bowen,* 154 C. C. A. 417 (241 Fed. 659), speaking of equitable maxims, it is said:

"Nor are these principles and rules, and this practice hard, fast, or without exception. They are rather advisory than mandatory, and the application of the rules and of their exceptions to each particular case as it arises is still intrusted to the conscience

of the chancellor. Yet these principles * * * serve to inform the intellect and enlighten the conscience, and by them the judicial discretion of the court must be guided.''

The court below required plaintiff as a condition of cancellation of the policies to return the premiums with interest to the date of tender. Defendants say that plaintiff's tender was defective and therefore that interest should be figured to the date of judgment. Plaintiff's tender was defective, they say, because it was of premiums of all policies issued to the partnership and demand for surrender of all policies, whereas by this action, only the policies on the lives of Allen and Cap are ordered canceled. Perhaps defendants are right that a tender which is too broad is the same as no tender. *Brink* v. *Freeoff,* 40 Mich. 610; *Dodge* v. *Brewer,* 31 Mich. 227. But it is unnecessary to decide that question as the evidence shows plaintiff did tender return of the premiums on the Allen-Cap policies separately.

The court permitted plaintiff on December 9, 1933, to tax the cost of the bond which was required before the issuance of the injunction which restrained all actions at law. Defendants say that since no action at law was pending, the statute, 3 Comp. Laws 1929, § 14350, did not require a bond and that such costs may not be taxed. Plaintiff says the bond ''is required by law'' and falls within Court Rule No. 5, § 7 (1933). The rule in question not being in effect at the time the bond was executed such costs are not taxable.

The decree is affirmed, with costs to plaintiff, excepting such costs as were taxed with respect to the bond.

POTTER, C. J., and NELSON SHARPE, NORTH, FEAD, WIEST, BUTZEL, and EDWARD M. SHARPE, JJ., concurred.