THE PEOPLE v. MICHAEL K. MILLS.

*Criminal law—Carnally knowing girl between 14 and 16 years of age—Previous chastity—Pleading—Evidence—Argument of counsel.*

1. It is the duty of police officers, not only to aid by all proper means in the arrest and conviction of criminals, but to detect and discover crime; and it is the duty of prosecuting officers to procure evidence of the commission of crime, taking whatever means are necessary for the securing of witnesses, and their protection when secured.

2. Counsel for a respondent cannot be allowed to provoke comment and criticism on the part of the prosecution, and then procure a reversal because charges and insinuations are resented and criticisms made.

3. Where a respondent's general character is put in issue by the defense, comment upon that character is clearly proper.

4. Where, on the cross-examination of a prosecutrix, testimony is drawn out tending to show that the witness, before the charge was made for which the respondent is being tried, had made general statements, respecting his general conduct, inconsistent with her testimony, it is competent for the prosecution to show on her redirect examination the circumstances under which the statements were made, and that they were made while she was under the influence of the respondent.

5. Lack of chastity cannot be used to impeach the credibility of a female witness.

6. Where a police officer has been present since the commencement of a criminal trial, seated at a table with the prosecuting officers, and his name has been frequently mentioned in the testimony, and it is clearly apparent to the court that the

failure to indorse his name on the information, as a witness for the people, was an oversight, it is not error for the court to permit such indorsement to be made after he is called and sworn as a witness, and his examination to proceed.

7. 3 How. Stat. § 9314a, which makes it a felony for any male person of the age of 16 years or more to carnally know any girl, theretofore chaste, of the age of 14 years, and not more than 16 years of age, with her consent, does not exclude from its protection a female who may have erred, but who has reformed, and for years led a virtuous life.

8. The use of the word "ravish," in an information for the offense created by 3 How. Stat. § 9314a, is unwarranted, but the addition of the words "with her consent" negatives any possible inference that another than the statutory offense was intended to be charged.

Error to Washtenaw. (Kinne, J.) Argued February 1, 1893. Decided February 17, 1893.

Respondent was convicted under 3 How. Stat. § 9314a, of carnally knowing a girl of the statutory age, theretofore chaste, with her consent, and sentenced to imprisonment in the State prison for five years. Judgment affirmed. The facts are stated in the opinion.

*Atkinson, Carpenter, Brooke & Haigh,* for respondent.

*A. A. Ellis,* Attorney General, *Allan H. Frazer,* Prosecuting Attorney, and *Samuel W. Burroughs,* ex-Prosecuting Attorney, for the people.

McGRATH, J. Respondent was convicted under Act No. 143, Laws of 1887, which is as follows:

" Any male person of the age of sixteen years or more who shall carnally know any girl, theretofore chaste, of the age of fourteen years, and not more than sixteen years of age, with the consent of such girl, shall, upon conviction thereof, be punished by imprisonment in the State prison," etc.

The complaining witness, Bernice Bickle, was 15 years of age in January, 1892. She had lived in Sarnia until December 21, 1891. Her father and mother were members of a sect styling themselves "Israelites," and respondent claimed to be the leader of that sect, with headquarters at Detroit. In October, 1891, he was at Sarnia, preaching at the home of Bernice. On that occasion Bernice was induced to play on the piano and sing for the respondent, whereupon respondent said to her mother that she should play the piano at headquarters. On December 15, 1891, respondent wrote the following letters, the first to Mr. and Mrs. Bickle, and the second to Bernice, signing them "Michael:"

"*Dear Brother and Sister Bickle:* I wrote Bernice for her to come. See that she comes as soon as possible with her piano here to headquarters, as early Monday morning God made known that she represents obedience, the last piece, the age of youth, or a child. Unless ye become as a little child, ye can in no wise inherit the kingdom of God; and the flesh shall become fresher than a child by obedience."

"Enclosed $10, and I desire you to get it changed in ten gold dollars, and give to her in my behalf; Michael Ishi, husband, representing the ten pieces. We have only had nine, but the women swept the house till she found the tenth, which is now found. Probably pa and ma would like to come too; if so, come on.

"Last Tuesday, as sister Court and I was being driven down town to do my business, where about a mile from our house, the power said, 'Get to the Wabash depot soon as possible, and take train for Toronto,' which I did, just getting there in time to intercept Thomas H. Baxter, and had to fall before the great light, as Saul, which he represented, as he said he went to persecute the Church of God; and it turns out that he is the apostle Paul, the man that has been bound in chains for the hope of Israel, and the learned man who sat at the feet of Gamaliel, the schoolmaster. Mr. John Maxwell' he is security to the pillars, and the one who laid down the laws to Baxter. Bro. Baxter is a changed man, and by the spirit power that is thrown on

him he will understand Paul's writings; and, as I represent both new and old testament, we are the boys to gather Israel.

"See that Bernice is here as soon as possible.

"Yours with love,

"MICHAEL."

"Well, dear Bernice, come to me. You are requested by the living God of Abraham, Isaac, and Jacob to come and place yourself in obedience to Michael, my son, as the last piece is now found, and you are that piece, the tenth piece in the God-Head, obedience; thus saith the Lord God. Come with piano, music, dear one, as you remember the words: piano, with Bernice, to headquarters.

"Thine, with love, thine; praise God, praise God, praise God.                                    MICHAEL."

On December 21, 1891, Mrs. Bickle took Bernice to Detroit, and delivered her over to respondent, at the house occupied by respondent, which was termed the "God-House." The occupants of this house were respondent, his wife, Mrs. Eliza Court, Alice Court, Emma Butler, Nellie Armstrong, May Webster, Carrie Bendry, and Ellen Rowlinson, and Bernice. There were four beds in the house. It is unnecessary to go into the disgusting details of what took place in this abode. It is sufficient to say that respondent, taking advantage of the innocence of the prosecutrix, and of her religious instincts; representing to her that he was inspired, and acting by divine command; that he was the son of man, and had been purified; that his purpose was her purification; and that her duty was obedience to him,— after repeated attempts on different occasions,—overcame her scruples, and had illicit intercourse with her, which he afterwards repeated. The prosecutrix and two other inmates of the house were called by the prosecution, and, although it was shown that for several nights respondent occupied the same bed with prosecutrix, and had reported to other inmates of the house her obstinacy in refusing to submit to him, the respondent did not take the stand to

deny any of these allegations.   One of the other inmates
of the house was called by the defense, yet she was not
interrogated as to these facts, and, although five other
persons occupied the house at the time, no one of these
was called to deny the story.

Error is assigned upon remarks made by the prosecuting
officers in the argument of the case to the jury.   At the
conclusion of the opening of the case to the jury by the
prosecuting attorney, counsel for defendant outlined the
defense.   He gave a brief history of the sect known as the
"New Israelites," and of respondent's connection therewith,
stating that in October, 1891, respondent claimed to have
undergone a physical change, in which he suffered great
agony, and by which the evil was burned out of his body;
that from that time he claimed to be, and his followers
believed him to be, the "Michael" spoken of in the twelfth
chapter of Daniel; that he believed himself to be divinely
commissioned to gather the lost tribes of Israel; that the
habits of this sect were peculiar; that the presence of these
people in such large numbers affected the price of real
estate in the part of the city where they resided; that a
mass meeting of citizens was called to devise means to rid
the community of them; that the newspapers published
sensational articles, charging them with immorality; that
the chief of police detailed one of the captains of the force
to look up evidence upon which to found some accusation
against them; that respondent's wife was induced to make
a complaint of adultery against him, and respondent was
arrested upon that charge; that all of the occupants of
the house known as "Headquarters" were taken into cus-
tody, and lodged in the police station; that Bernice Bickle,
May Webster, Alice Court, Carrie Bendry, and Emma Butler
were taken separately before the chief of police, and asked
to make a statement against respondent; that they all denied
that they knew anything against him; that they were cross-

examined, threatened, and locked up; that a statement was written out by the assistant prosecuting attorney, which Bernice Bickle was directed to sign; that, later, Bernice was ordered to copy a statement which had been made for her, alleging that respondent had had sexual intercourse with her; that the police had had constant charge of Bernice; that, in case she gave the testimony promised by the prosecuting attorney in his opening, it would be shown by her own admission that she was not, at the time alleged, a chaste girl; that she had been assured by the police officers that she would be taken care of after the trial was over; that money and inducements had been offered to one of the people's witnesses, who had been taken from the colony by her parents, to induce her to come from Toronto, to give her testimony; that it would be shown that May Webster, another of the witnesses for the prosecution, had, in a *habeas corpus* proceeding brought before respondent's arrest, testified as to the absolute purity of the respondent and his co-religionists. The learned judge who tried the case gave to respondent's counsel the widest latitude, and the line of defense indicated in this opening was followed in the cross-examination of the witnesses for the people and in the examination of the witnesses for the defense. The press, the police department, the prosecuting officers, and the witnesses for the prosecution were attacked, and the motives of the neighbors were impugned.

It is the duty of police officers, not only to aid by all proper means in the arrest and conviction of criminals, but to detect and discover crime. It is the duty of prosecuting officers to procure evidence of the commission of crime, taking whatever means are necessary for the securing of witnesses, and their protection when secured. The gravity of the offense here charged, the situation of the parties, and the environment of the witnesses would seem to have demanded prompt, vigorous, and heroic action by the

police authorities and prosecuting officers. There was no evidence in the case that would warrant the attack made upon either prosecuting officers or police. The course taken placed the prosecuting officers upon the defensive, and invited comment and criticism of respondent and his counsel that otherwise might not have been proper. Counsel for respondents in criminal trials cannot be allowed to provoke comment and criticism, and then procure a reversal because charges and insinuations are resented and criticisms are made.

Respondent's general character was put in issue by the defense, and comment upon that character was clearly proper. Conduct, rather than professions, is the test of character, and it was not improper to apply that test.

On cross-examination of the prosecutrix, it appeared that a statement of the facts had been prepared and signed by her. The witness testified that this statement had been prepared at the instance of the prosecuting attorney; that it was in his handwriting; that he had told her to make it; and that he drew it up and she signed it. The following question was put to her, and she answered it in the affirmative:

"You were taken by the officers down in a patrol wagon through the streets, put in a station, without seeing your mother, and were told to make these statements, and made them?"

It was entirely competent, upon redirect examination, and especially in view of the opening made by respondent's counsel, to show that this statement was in her own language, that no inducements or threats were held out to her in connection with its preparation, and that she was not asked to make any statement that was not in fact true.

On the cross-examination of the prosecutrix and May Webster, who was also a young girl, a believer, and an

inmate of the "God-House," testimony was drawn out which tended to show that the witnesses, before the present charge was made, had made general statements, respecting the general conduct of the respondent, inconsistent with their testimony.   Several witnesses were called by the defense to testify as to respondent's good reputation for morality and virtue.   These witnesses were members of the community of which respondent was the leader, and their testimony was that they regarded him "as an inspired being;" as "God's instrument;" that he was incapable of wrong, and that they would believe what he said.   It was clearly competent, therefore, to show by the prosecutrix and May Webster, upon redirect examination, the circumstances under which they had made contradictory statements; that they were made while under the influence of respondent; that they were taught that submission to his desires involved no wrong; that, as respondent had been cleansed and purified, the old man had gone away; that they could truthfully say that they had not had anything to do with him; and that any disclosures would be a betrayal of their "Master."   It was also proper to show, upon cross-examination of the other witnesses, what the relations were between them and respondent; that they were credulous; how they would be influenced in their estimate of what was right or wrong, immoral or unchaste, by what respondent had said, and their estimate of the character that he represented, or that they had attributed to him.

A witness who occupied the house was called to show that respondent and the prosecutrix had occupied the same bed, and as to statements made by respondent concerning the obstinacy of the prosecutrix.   On cross-examination she was asked if she was a chaste girl before she went to "Prince Michael's."   The testimony was properly excluded.   Lack of chastity cannot be used to impeach the

credibility of a female witness. *Jackson v. Lewis,* 13 Johns. 504; *Com. v. Churchill,* 11 Metc. 538; *Spears v. Forrest,* 15 Vt. 435; *Teese v. Huntingdon,* 23 How. 2; *Smith v. State,* 58 Miss. 867; *State v. Larkin,* 11 Nev. 314; *Jones v. State,* 13 Tex. 168.

A witness for the defense, called to establish respondent's good character, had testified that respondent was pure, kind, and loving in his disposition, and on cross-examination he was asked if he did not know that respondent had handcuffed his wife, and put her in a straight-jacket, and placed her in a back room in the house, and kept her there for a long time. The witness testified· that respondent had not handcuffed his wife, but had simply tied her hands and confined her in a back room because she was rebellious; that she was violent; and that her violence was occasioned by her jealousy " of his having the other girls in the house." There was no error in the admission of the testimony.

In the argument to the jury, the prosecuting attorney, commenting upon the story told by the prosecutrix, said: "Now, Eliza Court sits here. Has she denied it? Has anybody denied that statement?" Eliza Court had been intimately associated with all the circumstances of the story. She had been in the house, and had, according to the story told, occupied the same bed with Bernice and respondent during one night, and had left it early in the morning, leaving the prosecutrix alone with respondent. She was in court with respondent. We think the comment was entirely proper.

The deputy superintendent of police of the city of Detroit was the fourth witness called for the people. His testimony was objected to because his name did not appear on the information. It satisfactorily appearing to the court that he had been present since the commencement of the trial, seated at a table with the prosecuting officers, and

that his name was omitted by mistake, the court allowed his name to be indorsed, and his examination to proceed. Under the circumstances, we think the court did not err. The witness was well known as a public officer, and was conspicuously present during the trial. His name had frequently been mentioned in the testimony already taken, and it was clearly apparent that the omission of his name was an oversight.

The principal point relied upon by the defense was that the prosecutrix was not chaste previous to the commission of the offense charged, within the meaning of the statute. The evidence relied upon in support of this claim was a written confession obtained from her during her stay at respondent's house, which purported to set forth all of the sins of her life, and which, among other things, alleged that—

" Six or seven years ago I had to do with a boy named Elias Jones, because he threatened me that the ' Boo-man ' would catch me, and also my brother Frank coaxed me several times."

It may well be doubted, under the testimony relating to the occurrences referred to in this confession, whether there was any act which amounted to sexual connection or intercourse, and there was certainly no testimony showing any such indulgence or desire, or capacity or possibility of desire, or capacity for indulgence, as could be attributed to a want of chastity at that time. The age of the prosecutrix at that time affords at least a presumption to the contrary.

Clearly, the statute under which the charge is made does not exclude from its protection a female who may have erred, but who has reformed, and for years has led a virtuous life, nor can it be contended that it includes virgins only within its terms. In prosecutions for seduction, the previous character of the prosecutrix is necessarily in issue

(*People v. Knapp*, 42 Mich. 268); yet it has been held that a woman who had been previously seduced and has reformed may be the subject of a subsequent seduction, and that, if the time between the different acts is sufficiently long, a presumption in favor of reformation may arise. *People v. Clark*, 33 Mich. 112; *People v. Squires*, 49 Id. 487; *People v. Millspaugh*, 11 Id. 278. Under the statutes of many of the states, "previous chaste character" in the person alleged to have been seduced is necessary, and character, under such statutes, has been defined to be not external reputation for chastity, but actual personal possession of chastity; yet it has been held that one who falls from virtue, but afterwards reforms, is chaste, within the meaning of such a statutory provision. Whart. Crim. Law, § 1757; Bish. Stat. Crimes, § 649; *Carpenter v. People*, 8 Barb. 603; *Com. v. M'Carty*, 2 Penn. Law J. Rep. 351; *Wilson v. State*, 73 Ala. 527; *Benstine v. State*, 70 Tenn. 169; *State v. Timmens*, 4 Minn. 325; *State v. Brinkhaus*, 34 Id. 285; *State v. Carron*, 18 Iowa, 372; *State v. Dunn*, 53 Id. 526. In *Carpenter v. People*, the court held that the words "previous chaste character" mean actual personal virtue; that the female must be actually chaste and pure in conduct and in principle up to the time of the commission of the offense; and that the word "previous" must be understood to mean immediately previous, or to refer to a period terminating immediately previous, to the commencement of the guilty conduct of the defendant. And the court also lay down the rule that—

"If the female had previously fallen from virtue, but has subsequently reformed, and become chaste, there is no doubt but she may be the subject of the offense declared in the statute."

In *State v. Dunn*, testimony was offered tending to show lewd conduct occurring 8 years before the trial, when the prosecutrix was a girl of 14, but the court held that it

was too remote, and would not tend to establish an impure character at the time of the seduction.

"If as a child she was indiscreet, immodest, or impure, she may have reformed, and become a woman of chaste character. A woman who is unchaste may reform and gain a character for chastity, within the meaning of the statute defining the crime of seduction."

In *Wilson v. State*, it is said that it is not intended that the woman who may have at some time fallen cannot be the subject of seduction; that may be true, and there may be reformation, and at the time she yields "she may have the virtue of chastity, not in the high degree of the woman who has not strayed, but yet within the meaning of the statute, entitling her to its protection."

Conceding the possibility of the unchastity of the prosecutrix six or seven years before the act with which respondent is charged, the case comes clearly within the reason and principle of these authorities. It is not necessary to invoke the presumption of chastity arising from the lapse of time, for the evidence is uncontradicted that for six or seven years the prosecutrix had led a virtuous life. This conclusion renders a discussion of many of the allegations of error as to the admission of testimony respecting what the acts recited in the confession involved, and to what extent they were carried, unnecessary.

The court was requested, and properly refused, to instruct the jury that—

"Unless the jury believe that respondent, on the 21st day of February, 1892, with force and arms, in and upon Bernice E. Bickle violently and feloniously did make an assault, and her, the said Bernice E. Bickle, then and there did ravish and carnally know, he must be acquitted upon the information filed in this cause."

The words "with her consent" were contained in the information, but omitted from the request. The use of

94 MICH.—41.

the word "ravish" in the information was unwarranted, but the addition of the words "with her consent" negatived any possible inference that another offense was intended to be charged.

The record contains 107 assignments of error, a large number of which are unsupported by objection or exception, hence have not been considered.

Upon a careful examination of the assignments not already noticed, we find no prejudicial error, and the conviction is affirmed.

The other Justices concurred.