LUNDE *v.* DETROIT UNITED RAILWAY.

1. TRIAL — CROSS-EXAMINATION — RECROSS-EXAMINATION — MARRIAGE—EVIDENCE.

On recross-examination in a negligence case, defendant's counsel was rightly permitted to ask plaintiff about her marriage and to show that it was a common-law relation, where he had been prevented from inquiring into the matter in his cross-examination, but plaintiff's attorney had shown on redirect that she was recognized by the courts in certain litigation as the common-law wife of a decedent.

2. WITNESSES—CROSS-EXAMINATION.

The extent of cross-examination to show the true character of a witness, being left mainly to the discretion of the trial court, there was no prejudicial error in permitting defendant's counsel to show that plaintiff had conducted a house of doubtful reputation. The examination was not open to the objection that counsel was attempting to impeach the witness by showing unchastity.

3. NEGLIGENCE—DAMAGES—INJURIES TO PERSON.

Evidence that plaintiff, who sustained injuries in boarding a street car, had at one time lived in a house of ill repute, but had suffered no infection or other disease from which her injuries might have arisen, was insufficient to justify the court in charging the jury that plaintiff could not recover if her former mode of life and not the fall caused the condition from which she suffered.

Error to Wayne; Hally, J. Submitted June 19, 1913. (Docket No. 35.) Decided October 1, 1913.

Case by Emily Lunde against the Detroit United Railway for personal injuries. Judgment for defendant and plaintiff brings error. Reversed.

*Thomas W. Payne (George W. Coomer,* of counsel), for appellant.

*Corliss, Leete & Moody (Frederic T. Harward,* of counsel), for appellee.

KUHN, J. This cause, which on the trial below resulted in a verdict and judgment for the defendant, arises from a claim made by plaintiff that she sustained injuries from being thrown to the pavement by the starting of one of defendant's cars as she was about to board it at the corner of Michigan avenue and Shelby street in the city of Detroit. The errors relied upon on this appeal relate to the cross-examination of the plaintiff and the charge of the court.

Counsel for defendant, on cross-examination, sought to show her relations with a man named Lori-

mer, which testimony was excluded upon objection by plaintiff's counsel. On redirect examination the following occurred:

"*Q.* You were the wife of Thomas Lorimer, that died sometime in 1903, were you?

"*A.* 1895 it was that he died.

"*Q.* You had lived with him how many years?

"*A.* I had lived with him, yes, practically lived with him, for the last 25 years.

"*Q.* And the courts of the State of Michigan—

"*Mr. Harward:* You are aware, are you, Mr. Payne, that I have not gone into that on cross-examination? The court ruled I should not go into that on cross-examination. It was ruled out.

"*The Court:* What is the objection?

"*Mr. Harward:* Your honor ruled the testimony out, when I inquired about her relations with Thomas Lorimer. Now he is going into it on his redirect examination.

"*Mr. Payne:* Go ahead.

"*The Court:* Proceed. I do not understand there is any objection.

"*Q.* The courts of the State, after a lawsuit with relatives of Thomas Lorimer, decided that you were his wife?

"*A.* Yes, sir.

"*Q.* It is a matter of court record that you are a married woman for the last 30 years practically?

"*A.* Practically, yes, sir.

"*Q.* You are 53 years old now?

"*A.* Yes, sir."

Recross-examination:

"*Q.* You say you were the wife of Thomas Lorimer?

"*A.* Yes, sir.

"*Q.* After Thomas Lorimer died, you sued the estate, and claimed you were his common-law wife, did you?

"*Mr. Payne:* I object to this cross-examination.

"*Mr. Harward:* He brought it out himself.

"*Mr. Payne:* My examination was confined entirely to show that she was a married woman, and the courts of this State made her a married woman,

and the nature of the litigation that was carried on by any relatives in that matter. That is a matter of public record. I only put that in to show in view of this cross-examination something in her early life, that she was, according to the laws of this State, a married woman, was adjudged so by a jury and by the Supreme Court of this State.

"*The Court:* Take an answer.

"*Mr. Payne:* Note an exception.

"*Q.* You never had any marriage ceremony with Thomas Lorimer, did you?

"*Mr. Payne:* I object to it. It is a matter of public record, having been litigated in the Wayne circuit court and in the Supreme Court.

"*The Court:* Take an answer. Note an exception for plaintiff.

"*A.* I have to answer, Judge?

"*Mr. Payne:* Yes, answer the question.

"*A.* Why, no.

"*Q.* No. After he died you came in and claimed a third of his estate because you had lived with him, without a marriage ceremony, claiming you were his common-law wife, didn't you? '

"*Mr. Payne:* I object to that, make the same objection in view of that litigation.

"*Q.* Is that true?

"*Mr. Payne:* If there is any question, Mrs. Lunde, that he puts to you that is not true on its face, say so. I don't know anything about this third or anything else. I am not familiar with this litigation myself. I will ask the stenographer to read the question.

"*Mr. Harward:* You want to object, or what do you want to do?

"*Mr. Payne:* Calling the witness' attention to a fact that does not in fact state the true state of facts, she is not obliged to answer it.

"*The Court:* Proceed, please. (Question read by reporter.)

"*A.* Yes, sir; I believe, according to the records on that, that is the claim.

"*Q.* That is what you did, isn't it?

"*A.* Yes, sir.

"*Q.* You were finally declared his common-law wife?

"*A*. Yes, sir.

"*Q*. That is what you mean when you say you were married to Thomas Lorimer?

"*A*. Yes, sir; isn't that sufficient? Isn't that a marriage contract?

"*Q*. I am asking you, Is that what you mean when you say you were married to Thomas Lorimer?

"*A*. I have answered you. I answered you.

"*Q*. How did you answer?

"*A*. I answered you that I was married to Thomas Lorimer; yes, sir."

Exception is taken to this recross-examination. In view of the fact that the subject-matter of the examination was opened up by plaintiff's counsel on redirect examination, it was proper to allow the recross-examination.

On further cross-examination defendant's counsel showed that at one time plaintiff conducted a house of questionable reputation. It is urged that it was prejudicial error to allow the antecedents of the plaintiff and her former life to be brought before the jury. The extent of cross-examination for the purpose of showing the true character of the witness, so as to enable the jury to properly judge the weight to give the testimony, should be and is left to the discretion of the trial judge, and will not be reviewed unless this discretion is clearly abused.

There is a clear distinction between attempting to impeach a witness by showing a want of chastity and a cross-examination for that purpose. The former is not proper, while the latter, as has been said, is discretionary with the trial judge, and in the instant case we do not find that there was any abuse of such discretion. In the case of *Beebe* v. *Knapp*, 28 Mich. 53, 71, Justice CHRISTIANCY said:

"Beebe, having been, as it would seem, on cross-examination, asked how many times he had been married, said he had been married four times, that one of his wives was buried, and one of them at

home; was then asked, 'Where are the other two?'
This was objected to as irrelevant, the objection over-
ruled, and exception taken. His answer was: 'I can-
not tell; was first married 18 years ago.' He was
then asked, 'How long did you live with that woman?'
This was objected to, and the objection overruled,
and the witness answered: 'Seven years. I have not
lived with any other women besides these; not what
I call living with them.'

"These questions do not appear to have been put
for the purpose of founding upon them any other
questions pertinent to the issue, or any other fact in
his past life which might contradict any statement
made by witness, or in any way tend to impair his
credit, except the mere facts elicited in reference to
the women referred to. I think the court would have
wisely exercised its discretion in excluding the evi-
dence. But on cross-examination the court must be
allowed considerable latitude of discretion in per-
mitting questions calculated to elicit any information
as to the past life and conduct of the witness, and to
enable the jury to see 'what manner of man he is,'
and we cannot, therefore, say that it was error in law
to permit these questions. See *Comstock* v. *Smith*,
20 Mich. 338."

See, also, *Threadgool* v. *Litogot*, 22 Mich. 271; *Mc-
Bride* v. *Wallace*, 62 Mich. 451 (29 N. W. 75).

Before allowing this class of questions to be put
to a witness, the court should be satisfied that they
are asked by counsel in good faith, and in the case
of *People* v. *Gotshall*, 123 Mich. 474 (82 N. W. 274),
cited by plaintiff's counsel, a reversal was had be-
cause want of good faith on the part of counsel was
apparent. In the case before us there can be no ques-
tion of the good faith of counsel, because the witness
admitted that she had lived in a house of evil repu-
tation. In *Knickerbocker* v. *Worthing*, 138 Mich.
224, 238 (101 N. W. 540, 545), Mr. Justice MONT-
GOMERY, in speaking of the case of *People* v. *Mills*,
94 Mich. 637 (54 N. W. 488), also relied upon by
plaintiff's counsel, said:

"It was also held in *People* v. *Mills,* 94 Mich. 637 [54 N. W. 488], that it was not error to exclude the inquiry attempted in that case on cross-examination. The statement in the opinion is very brief, and, if understood as holding that the court may not, in its discretion, permit, on cross-examination, an inquiry into the past life of a female witness, and an inquiry as to her chastity, is misleading."

As to the charge of the court. The trial judge, in charging the jury, said:

"If you believe that the plaintiff's physical condition is caused by her former mode of living, and not by any injuries that she received at the hands of the defendant company, then you are not to allow her for such injuries."

This naturally assumes that there was evidence in the record that the injuries she claimed might have been caused by her former mode of living. The only testimony upon this question was that brought out on the cross-examination of Dr. Sanderson, one of the medical witnesses sworn by the plaintiff:

"*Q.* Would a woman's life, had she been perhaps a demimonde in her life—would that tend to prolapse the uterus?

"*A.* No, sir.

"*Q.* Sexual intercourse, no matter how frequent or promiscuous, would not affect the uterus—do you mean to say that?

"*Mr. Payne:* I want to object to all this. There is no time fixed any way. I want the time and the place placed on the record. Mr. Harward is trying to make out that she was a demimonde, as he calls her.

"*Q.* I said, would the life of a demimonde—I think I have got a right to ask him under the testimony in this case, and under the admissions of the plaintiff, your honor.

"*The Court:* You may proceed. Note an exception for the plaintiff.

"*Q.* I say, would the life of such a woman tend to affect her uterus in any way?

"*The Court:*   That question has been answered, I think.

"*Mr. Harward:*   What?

"*The Court:*   That question was answered, I think, by the doctor.

"*A.* It might not cause any injury to the uterus at all, unless it were an infection.  There are no evidences or signs of such now, or of womb infection. There are no symptoms in the womb of infection. When I looked her over, there wasn't any evidence that there had been any infection, none whatever. Such a life has no effect on the organs that she complains of here, unless there is an infection, or pregnancy develops; the mere fact of intercourse does not injure the uterus at all.  Of course, the uterus might be infected, or pregnancy might come on, and there is a child born or a miscarriage, and that might affect the uterus.  Infections, gonorrhea, and such might cause prolapsus in a roundabout way by producing congestion of the uterus, an enlargement of the uterus.  I have seen such caused in women.  It is not a very frequent cause; but it is a cause.

"*Q.* From the inflammation set up the gonococcus?

"*A.* Yes, sir; but there is none in this case.

"*Q.* Well, that is a frequent cause, is it not?

"*A.* No, not a frequent cause.  It has occurred; but it is not frequent.

"*Q.* I think that's all.

"*Mr. Payne:*   Now, Doctor, you found no evidence of any diseases of any kind?

"*A.* No, sir; it is in a relaxed condition.

"*Mr. Payne:*   That is all."

It appears from this testimony that there was no evidence that the plaintiff ever suffered from such disorders as a result of her past life which might have caused the injuries complained of.  The evidence is clear that no such condition was discovered by the doctor.  It was therefore improper to submit the question to the jury.  In the instant case, as it is impossible to tell whether the jury disregarded this in arriving at their verdict, it was prejudicial error to submit it to them.  38 Cyc. p. 1638; *Clark* v. *Rail-*

*way Co.*, 149 Mich. 400 (112 N. W. 1121, 12 Am. & Eng. Ann. Cas. 559).

For this reason, the judgment of the trial court must be reversed, and a new trial granted.

STEERE, C. J., and MOORE, MCALVAY, BROOKE, STONE, OSTRANDER, and BIRD, JJ., concurred.