PEOPLE v. DAVIS.

1. CRIMINAL LAW—MURDER—EXAMINATION—PROBABLE CAUSE—EVIDENCE—SUFFICIENCY.

In a prosecution for murder, where defendant stood mute on arraignment, evidence *held*, sufficient to justify the finding of the examining official of probable cause to believe defendant guilty.

2. WITNESSES—CONTRADICTORY TESTIMONY — EXPLANATION PERMISSIBLE.

In a prosecution for murder, where a witness for the prosecution had told conflicting stories upon the stand, it was proper for the trial court to permit him to explain why he had done so; the weight of his testimony being for the jury.

3. CRIMINAL LAW—EXPERT WITNESSES—OPINION EVIDENCE—PROVINCE OF JURY.

Where the county chemist, who had examined the blood spots on defendant's coat, had explained the difference in appearance when blood was dropped on a garment and when it "squirted from a bleeding artery," it was not error, as invading the province of the jury, for the

On admissibility of previous statements by a witness out of court consistent with his testimony, see note in 41 L. R. A. (N. S.) 857.

trial court to allow him to express the opinion that the spots on defendant's coat were "squirted" on.

4. EVIDENCE—SELF-SERVING STATEMENT—ADMISSIBILITY.
A statement made by defendant at police headquarters following his arrest, which was taken by a stenographer who was called by defendant for cross-examination, was properly held inadmissible as a self-serving statement.

5. CRIMINAL LAW—TESTIMONY AS TO OTHER OFFENSES NOT PREJUDICIAL WHERE AFTERWARD TESTIFIED TO BY DEFENDANT.
Although the trial court might well have excluded testimony by a police officer that defendant told him he had been engaged in bringing "booze" from Toledo to Detroit, its admission was not reversible error where defendant, who was a witness in his own behalf, subsequently admitted, on cross-examination, that he "was running whisky a little while."

6. HOMICIDE—TRIAL—INSTRUCTION AS TO DEGREE OR MANSLAUGHTER.
In a prosecution for murder, an instruction by the trial judge that the crime could scarcely be manslaughter, and that the jury should exercise great caution in examining the evidence and should carefully consider the definition given of the degrees of murder, before arriving at a conclusion that there was anything in the evidence to reduce the homicide from murder in the first degree to murder in the second degree, if satisfied there was any murder, held, not reversible error, as taking from the jury the question of murder in the second degree or manslaughter, where there was no testimony from which the jury might have inferred that deceased was killed under circumstances which would reduce the homicide from murder to manslaughter, and in another part of the charge the jury were carefully instructed as to the different degrees of murder.

7. CRIMINAL LAW—TRIAL—JURY TO DRAW INFERENCE FROM FACTS.
In the consideration of cases, juries must be governed by the evidence submitted; they must determine the facts, and may then draw any reasonable inference fairly deducible therefrom.

8. HOMICIDE—FIRST DEGREE MURDER—EVIDENCE—SUFFICIENCY.
Conviction of murder in the first degree, held, supported by the evidence.

Error to recorder's court of Detroit: Wilkins

(Charles T.), J.     Submitted January 12, 1922.
(Docket No. 152.)    Decided March 30, 1922.

William Davis was convicted of murder in the first degree, and sentenced to imprisonment for life in the State prison at Marquette.    Affirmed.

*Chawke & Sloan,* for appellant.

*Merlin Wiley,* Attorney General, *Paul W. Voorhies,* Prosecuting Attorney, and *Harry S. Toy* and *Robert M. Toms,* Assistants Prosecuting Attorney, for the people.

SHARPE, J.    The dead body of one Earl Zang was found on the sidewalk near the corner of Fort and Sixth streets in the city of Detroit about 5 o'clock in the morning of March 7, 1921.    His death was caused by two knife wounds, one in the side, the other in the neck.    He had spent a part of the night before in the company of defendant and others in the Carlsbad hotel.    He and defendant left this hotel about 4 o'clock.    Defendant arrived at the Metropole hotel, where he was rooming, between 4:30 and 5 o'clock. The Carlsbad is at 292 Cass avenue.    It is about 20 minutes' walk from where the body was found to the Carlsbad and about 17 minutes' walk to the Metropole.    One Arthur Daniels was in the Carlsbad when Zang and the defendant left.    He went to defendant's room at the Metropole about 5 o'clock and found him there.    Daniels was himself arrested, and it is claimed stated fully to the officers the facts afterwards testified to by him, but, on the preliminary examination and also when first interrogated on the trial, claimed he had little recollection of what had occurred that night.    The trial lasted over the week end and on the following Monday Daniels testified that the defendant, just before leaving the Carlsbad, said to him, referring to Zang, "I am going to bump him

off;" that while in defendant's room at the Metropole he helped defendant wash bloody spots from his clothing and shortly afterwards, while riding in a cab to the Hoffman house, defendant said, "I done it." The defendant was convicted of murder in the first degree and sentenced to imprisonment for life. The errors assigned will be considered in the order discussed by counsel for the defendant in their brief.

1. Defendant stood mute on arraignment. Before the jury was sworn, his counsel moved to dismiss the prosecution for the reason that no sufficient proof had been produced to justify the finding of probable cause to believe the defendant guilty. There was proof that defendant and Zang left the Carlsbad together; that soon after Zang's body was found; that the distances were such that defendant could have walked to the place where the body was found and thence to the Metropole hotel, at the time he arrived there; that he was brushing his coat at the time Daniels arrived at his room at the Metropole; that Daniels "took water and rubbed and brushed it off;" that defendant after his arrest said "it looked rather dark for him, but that he thought he had a chance about it;" that when he saw the officers he said he "suspected a 'knock off' for the Zang job. He said he switched his money when the officers came in;" that he told one of the officers he left Zang at the Carlsbad and went direct to the Metropole in a taxicab; that the spots on his coat "looked like blood;" that there were "blood spatters on the skirt of the coat and some on the sleeves and some around the overcoat here; some on the lapel of his coat and some spatters of blood on the breast of his coat;" that defendant said "he had gotten the blood on him while trying to separate these two men" who had been fighting. The wounds which caused death were described by the county physician. We think there was sufficient proof to justify the action of the examining official.

2. Error is assigned on the action of the trial court in permitting Daniels to explain why the testimony given by him on Monday was contradictory to what he had testified to on Saturday. He first stated that his wife had urged him "to go upon the stand and tell the truth" and afterwards said that the reason he had not told the truth was because his life had been threatened.

Counsel for the defendant cite no authority in support of their claim that the examination permitted constitutes reversible error. It may be observed that the testimony objected to in no way connected the defendant with the commission of the crime charged. The testimony given by Daniels on Monday was in conflict with that given by him on Saturday and also with his testimony on the preliminary examination. It would be strange, indeed, if the prosecution could not be permitted to elicit from the witness the reason for this conflict. It was for the jury to determine what weight should be given to his testimony and, in fairness to the witness as well as to the prosecution, he had the right to explain the reasons for his conflicting statements.

The rule is well stated by Mr. Potter in his work on Michigan Evidence, § 322, as follows:

"Full liberty of explanation should always be given to witnesses. * * * No witness should be debarred from such explanation or statements concerning former testimony or its circumstances as the witness may deem important. The candor and reasonableness of the explanations are for the jury. * * * A prosecutrix in a rape case in explanation of her contradictory statements may show that her testimony on one occasion was given under the influence of religious conviction that intimacy with defendant was not wrong (citing *People* v. *Mills,* 94 Mich. 630). * * * The fact that a witness testifies different on one trial than on another without explanation may be considered as affecting his credibility, and when the

conflict of testimony is sought to be explained the explanation may be considered with the testimony."

See *Sinclair* v. *Hathaway,* 57 Mich. 60, and note to *Rogers* v. *State,* 41 L. R. A. (N. S.) 857 (88 Ark. 451, 115 S. W. 156), on page 912 *et seq.*

3. Dr. John E. Clarke, county chemist, examined the spots of blood on defendant's coat. He explained the difference in appearance when the blood was dropped on a garment and when it "squirted from a bleeding artery." He was then asked:

"*Q.* Can you say that the blood was dropped on, or was squirted on? * * * As by a bleeding artery? * * *

"*A.* My opinion is, it was spread on.
"*Q.* Sprayed?
"*A.* Squirted."

It is said that the province of the jury to determine the fact was thus invaded. We think it was a matter in which the jury could well be aided by the opinion of the expert.

4. While in police headquarters following his arrest, defendant made a statement which was taken by a stenographer. The name of this stenographer was placed on the information as a witness for the prosecution. He was called at the request of the defendant for cross-examination and asked to read this statement to the jury. On objection, such request was refused, for the reason that "You can't use a self-serving statement." Counsel cite no authority to support their claim that this statement was admissible. Clearly, it was not so and for the reason stated by the trial court.

5. Edward Mitte, a police officer, talked with defendant soon after his arrest. He detailed at length the statements which defendant had made to him explanatory of his whereabouts after he left the Carlsbad hotel and what he heard him say in explanation

of how the blood spots came to be on his coat.    He was cross-examined at length, in the course of which he testified:

"I asked him if he wanted to clear up this case. I asked him what he had been doing throughout his life. . I talked about that."

On redirect, over objection, the witness was permitted to state further details of the conversation in which he testified the defendant told him he had been engaged in bringing "booze" from Toledo into Detroit and the manner in which this business had been conducted.    The defendant was a witness on his own behalf.    On cross-examination, he admitted that he "was running whisky a little while" and that he had heretofore been arrested and convicted several times. While the trial court might well have excluded the testimony complained of, we do not think, in view of the subsequent admissions of the defendant, that prejudice resulted from its admission.

6. The following instruction is said to have been erroneous:

"It seems to me scarcely necessary for me to instruct you in this case as to manslaughter, I think, for you to consider that crime in your deliberations, for under the evidence in this case, the crime, if you find that the crime was committed, could scarcely be manslaughter.    There is no evidence here of any provocation or passion which would reduce the crime— if you are satisfied beyond a reasonable doubt that the crime was committed—from murder to manslaughter. It was either murder, or no crime was committed, as I view the evidence.    I think that I should say to you that if you are satisfied beyond a reasonable doubt that the homicide was committed as testified, you should exercise great caution, in examining the evidence, and should carefully consider the definition that I have given you of the degrees of murder before arriving at a conclusion that there is anything in the evidence to reduce that homicide from murder in the first degree to murder in the second degree, if satisfied that

there was any murder.    Although, of course, you have the right, being the sole judges of the fact (if you do find that the crime was murder, first) to find that the crime was murder of the first degree, or murder in the second degree or manslaughter."

It is said that by this instruction the court "practically took from the consideration of the jury the question of murder in the second degree or manslaughter." In the consideration of cases, juries must be governed by the evidence submitted.    They must determine the facts.    They may then draw any reasonable inference fairly deducible therefrom.    There was no dispute about the cause of Zang's death.    The defendant denied being present when it occurred.    There was nothing to indicate a quarrel or altercation.    There were no bruises or wounds on the body of Zang except those made by the knife which killed him.    There was nothing in the appearance of the defendant when seen at the Hotel Metropole while indicated that he had been engaged in a quarrel with Zang or that, if he struck the fatal blows, they were inflicted under such circumstances as would have reduced the crime from murder to manslaughter.    In another part of the charge, the jury were carefully instructed as to the different degrees of murder.    The language above quoted was but a caution that they should carefully consider the instruction given in determining the degree in case they found the defendant guilty of murder.

We do not think the cases relied on by defendant controlling.    In *People* v. *Droste,* 160 Mich. 66, there was evidence that "loud and angry threats" were heard by nearby witnesses.    We find nothing in the testimony from which the jury might have drawn an inference that Zang was killed under circumstances which would reduce the homicide from murder to manslaughter.

There was abundant testimony, if believed by the jury, to support the conviction. The defendant was fairly tried and ably defended.

The conviction and sentence are affirmed.

FELLOWS, C. J., and CLARK, BIRD, MOORE, and STEERE, JJ., concurred. WIEST, J., concurred in the result.

The late Justice STONE took no part in this decision.